Argued March 6, affirmed April 2, 1969

KOSIK, *Appellant, v.* GEORGE, *Respondent.*
452 P2d 560

*Fred A. Anderson,* Tigard, argued the cause and filed the briefs for appellant.

*Richard R. Carney,* Portland, argued the cause for respondent. With him on the brief were Thomas F. Levak and Carney & Haley, Portland.

Before PERRY, Chief Justice, and SLOAN, GOODWIN, HOLMAN and HAMMOND, Justices.

HAMMOND, J. (Pro Tempore).

This suit for declaratory relief is brought by plaintiff as the daughter and only child of Earl Robert George against the defendant individually and as administratrix of the estate of Earl Robert George. Defendant is the widow of Mr. George. Plaintiff asks that the court declare that the defendant has waived and released all rights as surviving widow of the decedent in and to his estate by virtue of the execution of a prenuptial agreement. Defendant asks that the prenuptial agreement be declared void.

Plaintiff appeals from a decree declaring the prenuptial agreement void and of no effect.

In 1943, defendant, then Marian F. Stevenson, met Earl Robert George when he, as a real estate broker, handled a transaction wherein the Stevensons purchased a home. Defendant and Mr. George saw each other after that on occasion until 1952. Defendant was divorced from Mr. Stevenson in 1955 and Mr. George and his then wife were divorced in 1956.

On Palm Sunday in 1957 Mr. George called defendant on the telephone for reasons related by defendant as:

"A He had heard that I was free, and he had gotten a divorce from Faye George, and he wanted to know if he could come out and see me."

Defendant was then clerking in an east Portland department store and Mr. George was running his real estate business in the same city.

Although the parties had not seen each other for five years, Mr. George spoke of marriage the first night they were together. The couple were together every evening after that first meeting until their marriage eight days later. Wednesday night Mr. George brought out a diamond engagement ring, put it on defendant's finger and she accepted it. Either that evening or the next the parties talked about a prenuptial agreement but they did not discuss their respective worth or holdings.

On Friday evening Mr. George took defendant to the home of his attorney so that they could sign an agreement that the attorney had prepared at his request, which agreement is the subject of this controversy. The prenuptial agreement was signed by the parties and they were married the following Monday.

The agreement was recorded by Mr. George the next day. The parties remained married until the death of Mr. George March 13, 1967.

At the time of the marriage the defendant's resources had a value of approximately $4,000, while Mr. George was worth about $100,000. After the marriage Mr. George bought the parties a home valued at about $14,500. Title was taken by the couple as tenants by the entirety. Defendant also became the beneficiary of a $5,000 policy on the life of her husband. The decedent's estate was appraised at $89,515.46. He left no will.

Defendant states that the couple did not discuss their financial worth or their properties before the marriage. She said she knew that Mr. George had an office, a ranch and some beach property, but other than that she knew nothing of his holdings. When asked about their conversations defendant stated:

"Q Now during this week—from Palm Sunday to Easter Sunday—and you being together every day of the week, or every evening, did you discuss your individual affairs?

"A Are you referring to my personal money, or—

"Q Yes, I'm referring to your worldly goods and his.

"A No, sir.

"Q You didn't discuss it at all?

"A No, sir.

"Q It wasn't mentioned?

"A How much he was worth and how much I was worth, not once."

Defendant could not remember when she learned that Mr. George was worth approximately $100,000,

but a witness called by plaintiff testified that she met defendant at the store where she worked and that defendant told her that she was going to marry Earl George, a wealthy real estate man, and that she didn't have to work any more or worry about her children.

The attorney who drew the prenuptial agreement had been Mr. George's lawyer for several years. He testified about his instructions from Mr. George and about preparing this agreement as follows:

"A He came and told me he was getting married. He wanted to know what he could do to keep his estate in his own name after he was married.

"Now Mr. George was in the real estate business. He knew all about dower and curtesy, and that type of thing.

"He asked me if there was any way to keep his estate separate, and I told him he could enter into a prenuptial agreement.

"Q Did he state anything in that conversation about his intended spouse and her rights?

"A All he told me was she had her own property, and he had his, and he didn't tell me the extent of either one of them.

"\* \* \* \* \*

"A He called me later on the telephone and told me to write it up, and I did.

"Q And what did you write up?

"A The agreement I have in my hand.

"Q In the form that appears there?

"A Yes. I took this form out of an Oregon Supreme Court case that I just read. Randall Kester wrote the opinion, and I wrote it word for word, except changing the name,—which I did.

"Q And is that the Moore versus Schermerhorn case?

"A Yes. I think that's the name of the case all right.

"Q  Then what is the next thing that happened?

"A  The next thing that happened, Mr. George called me and asked if I would take my seal home, that he and Mrs. Stevenson—the intended Mrs. George—would come by the house and sign the agreement."

Defendant did not consult a lawyer before signing the agreement and was not asked by Mr. George's attorney whether she had an attorney nor was she told that she had a right to have independent counsel. She had a high school education and very limited business experience. She did read the prenuptial agreement before she signed it, but it appears clear from the record that she received no copy of the agreement. She related her understanding of the agreement as follows:

"Q  Is this a fair statement of what your understanding was: That the agreement proposed that the property he had before his marriage, he could dispose of it as he saw fit, and your property you had before your marriage, you could dispose of as you saw fit, but you understood you would be taken care of?

"A  Yes, sir."

She spoke of her motive for signing the agreement in this testimony:

"Q  Now after that first—when Mr. George asked you if you would sign this agreement, what did you tell him?

"A  I told him yes. I trusted him. Why not?

"Q  In other words, it was all right with you at that point that each of you would have a right to dispose of your own properties as you saw fit?

"A  He said it would be just like any other married couple."

It does not appear from the record that any detailed explanation of the prenuptial agreement was made to defendant by anyone. The attorney could remember no specific explanation being made, but when asked whether he made any explanation to the defendant about dower or curtesy the following explanation was given:

> " 'Answer: . . . I might have told her—I might have explained that, because there's only one purpose of this agreement, and that's to avoid dower and courtesy [sic], and if the question came up I might have explained it to her along those lines, I don't know. But my recollection is that my understanding was that Earl had explained all of this prior. My function was to prepare the papers, and certainly, as I remember the situation very vividly, there were no problems * * *. It was cut and dried. I mean it was something that they worked out and I was just writing up the papers.' "

It is now important to recall the testimony of Mr. George's attorney who stated that the prenuptial agreement executed by Earl Robert George and Marian F. Stevenson (except for the names of the parties and date of execution) conforms exactly to the wording of the agreement set out in *Moore v. Schermerhorn,* 210 Or 23, 307 P2d 483, 308 P2d 180 (1957), 65 ALR2d 715 (1959). In view of the availability in *Moore* of a complete duplicate of the agreement now in question, we see no reason to publish it again *in haec verba,* but summarize the agreement to provide: A. That the husband's right of curtesy in the wife's separate estate is barred; B. That the wife's right of dower in the husband's separate estate is barred; and C. Each party agrees to make no claim to the separate property of the other at any time thereafter.

While there is no record here regarding any ad-

vice being given defendant about the effect of the prenuptial agreement she was asked to sign, we may conclude that if the attorney advised her at all it was as quoted above, "* * * [T]here's only one purpose of this agreement, and that's to avoid dower and courtesy [sic], and if the question came up I might have explained it to her along those lines, I don't know." Such advice, if given, would have been *contra* to the decision in *Moore v. Schermerhorn,* supra, since the thrust of the opinion in that case was that the agreement did act to bar a surviving spouse's right to claim property exempt from execution under ORS 116.010, but the opinion left undecided whether dower and curtesy were also barred.

It is obvious, therefore, that more than dower and curtesy were involved in the agreement presented to the defendant.

■ The relationship between the parties to a prenuptial agreement is fiduciary in character if the agreement was entered into after the parties became engaged. *Newton v. Pickell,* 201 Or 225, 269 P2d 508 (1954); *Watson v. Watson,* 5 Ill2d 526, 126 NE2d 220 (1955); 41 CJS 572, Husband and Wife § 99.

■ Where, by the terms of a prenuptial agreement, the provision for the wife as the survivor is clearly disproportionate to the husband's wealth, it raises a presumption of designed concealment, and places the burden on those claiming under it in his right to show that there was a full knowledge and understanding on the part of the wife at the time of execution of all the facts materially affecting her interests, viz., the extent of his wealth and her rights in his property as his survivor, and how modified by the proposed agreement. *Denison v. Dawes,* 121 Me 402, 117 A 314 (1922); *Levy v. Sherman,* 185 Md 63, 43 A2d 25 (1945); *In re*

*Estate of Mosier: Mosier v. Mosier,* 72 Ohio L Abs 268 (Franklin County P Ct), 58 Ohio Op 369, 133 NE2d 202 (1954); *Stotler v. Stotler et al,* 19 Ohio NP (ns) 369, 27 Ohio Dec 303 (1916); *In re Estate of Maag,* 119 Neb 237, 228 NW 537 (1930); *Baker v. Baker,* 24 Tenn App 220, 142 SW2d 737 (1940).

Mr. George was a man of extensive business background, described by his attorney to have been a very brilliant man in his field of work. It was his duty to see that defendant was fully informed concerning the rights she was surrendering. *Simpson v. Simpson's Ex'rs.,* 94 Ky 586, 23 SW 361 (1893); *Spurlock v. Brown,* 91 Tenn 241, 18 SW 868 (1892). See Annotation, Lindey, Separation Agreements and Ante-Nuptial Contracts 638, 652 (1937), and Note, 55 Dick L Rev 382-91 (1950-1951).

■ We deem it unnecessary to decide whether defendant had adequate knowledge of the worth of Mr. George before she signed the prenuptial contract and before entering into the marriage, but we do hold that George breached the fiduciary relationship existing between him and defendant by securing her signature to the proposed agreement without first according to defendant a reasonable opportunity to learn what property rights she would have as his wife (and potentially as his widow) that would be altered or extinguished by the agreement.

■ The fact that the parties were engaged, coupled with a wide disparity in their business experience, knowledge and financial worth, invoked a responsibility in George and his attorney to fully inform defendant regarding the consequences of executing the agreement proffered to her, a duty that was neglected. The agreement was therefore invalid.

Affirmed.