Argued and submitted July 8, reversed and remanded for further proceedings
November 9, 1983

In the Matter of the Marriage of

KNOLL,
*Respondent - Cross-Appellant,*
*and*

KNOLL,
*Appellant - Cross-Respondent.*

(29867; CA A25285)

671 P2d 718

William M. Holmes, Bend, argued the cause for appellant - cross-respondent. With him on the brief was Gray, Fancher, Holmes & Hurley, Bend.

John S. Cavanagh, Portland, argued the cause for respondent - cross-appellant. With him on the brief was Bolliger, Hampton and Tarlow, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

Warren, J., dissenting.

## ROSSMAN, J.

■ Husband appeals the trial court's invalidation of the antenuptial agreement entered into by him and his wife.[1] We find the agreement to be valid and reverse the trial court. Our review in dissolution cases is *de novo;* however, we give deference to the trial judge's opportunity to observe the witnesses first hand. *McCoy and McCoy,* 28 Or App 919, 923-24, 562 P2d 207 (1977).

The parties began dating in 1976, when wife was living in Portland. At that time, husband was 40 years old and wife was 30. Both parties had been married before. Wife had been working for 12 years as a dental assistant. In May, 1976, she moved to Bend and began living with husband, who was involved in a variety of commercial enterprises. Eventually, wife began working for husband on his various projects. By the time the couple married, she had become quite knowledgeable about his businesses. She handled the bookkeeping and the payroll and was in charge of ten business checking accounts. She was actively involved in husband's construction business, arranging financing, monitoring progress, aiding with building inspections and marketing the completed houses. She even helped run husband's fish processing plant. She did not receive a salary for any of her services, which varied from part to full-time.

■■ Anticipating marriage, the parties discussed the necessity for an antenuptial agreement in March, 1977. In April of that year, husband's attorney drafted an agreement and provided wife with a copy, urging her to seek independent counsel.[2] This advice was repeated often over the next seven

---

[1] Wife raises other issues by cross-appeal, but we find it unnecessary to address them, given our disposition of the case.

[2] The text of the antenuptial agreement was approximately seven typed pages and can be summarized as follows: Each party retained complete control of and responsibility for all separately owned property acquired before the marriage and all property acquired after the marriage by either party in his or her individual capacity, including debts incurred in connection with the property, as well as proceeds, rents and profits derived therefrom. Neither party acquired any rights of inheritance, dower, curtesy, homestead or other benefits provided for surviving spouses in the property of the other by virtue of marriage. Each party agreed to execute, on request, all necessary instruments to enable the other party or other party's heirs to bargain, sell or otherwise dispose of the other party's separate property, and each party acknowledged that he or she had given to and received from the other, a full, complete and satisfactory disclosure of assets.

or eight months during the course of regular phone conversations between wife and husband's attorney concerning husband's business. In spite of those frequent urgings, wife testified that she failed to seek counsel or even to read the agreement. In December, 1977, just prior to their marriage in Reno, husband and wife signed the agreement and had it notarized. That document was subsequently lost, but in 1980, in response to an institutional lender's requirement that husband submit written evidence of the antenuptial agreement, the parties signed a duplicate and an affirmation, in which they acknowledged that the original document, signed in 1977, was in full force and effect. Although no one ever explained the agreement to wife section by section, husband did make it clear that he was trying to preserve his property for his children and to hold her harmless from any of his business debts. Wife's testimony on this issue differs substantially from husband's, but it was disregarded by the trial judge, because he found it not credible.

Antenuptial agreements are not only recognized in Oregon, they are favored. ORS 108.140; *Coward and Coward,* 35 Or App 677, 680, 582 P2d 834 (1978). But the fiduciary relationship existing between fiances requires

"* * * good faith and a full and frank disclosure of all circumstances materially bearing on the contemplated agreement, generally including full disclosure of assets:

" 'The exercise of good faith necessitates disclosure by the prospective husband of all material facts relating to the amount, character and value of his property, so that the prospective wife may have sufficient knowledge on which to base her decision to enter into the agreement.' 2 Lindey, Separation Agreements and Ante-Nuptial Contracts 90-43, § 90 (1967) and many cases cited thereunder." *Bauer v. Bauer,* 1 Or App 504, 507-08, 464 P2d 710 (1970).

Ultimately, however, the validity of an antenuptial agreement depends on the circumstances of each particular case and the degree of sophistication possessed by the party against whom the agreement is being enforced. *See Merrill v. Merrill,* 275 Or 653, 656, 552 P2d 249 (1976); *Kosik v. George,* 253 Or 15, 452 P2d 560 (1969); *Coward and Coward, supra.*

Judged in the light of the circumstances in this case, and given wife's range of experience, we find the agreement valid. The agreement was invalidated by the trial court,

because no one had provided wife with a detailed explanation of it. In the context of this case, we believe that such a requirement would be pushing husband far beyond what is legally required and into the realm of chivalry.

■■ Wife was 30 years old and entering into her second marriage. She had worked outside the home for 12 years prior to moving to Bend and continued to do so in Bend, both before and after the wedding. She was advised of the necessity of a antenuptial agreement by husband at least nine months before the wedding. She knew that its purpose was to preserve husband's assets for his children and to protect her from husband's business debts. At least seven months before the wedding, she was given a copy of the actual agreement and was advised to seek independent counsel. That advice was repeated often. Moreover, she had great familiarity with husband's business. We are not attempting to say, as the dissent erroneously suggests, that wife was an expert on literally every aspect of husband's business. Such a statement would not only be hard to justify, it would add nothing to our decision. The sole reason for requiring a disclosure of assets is to advise the prospective spouse of the nature and amount of property that the antenuptial agreement will affect. Because husband's only substantial holdings were his business enterprises, wife's ongoing employment in those ventures provided her with an adequate disclosure. Accordingly, we find that she had a good understanding of the nature of husband's assets and realized that the assets had substantial value, although she may not have known his precise net worth.

■ We acknowledge that husband had more to gain from enforcing the agreement, and we agree with the dissent that he was subject to a fiduciary duty, but more than husband's duty is involved here. Wife had an obligation to take steps to protect her own interests. She was reminded of the importance of the agreement each time she was readvised to seek counsel. In spite of that, according to her, she never once even attempted to read the agreement or seek counsel during the seven months from the time the agreement was presented to her and the time she signed it. And yet, she now cries "foul" because she claims that she did not understand the full impact of the agreement. Intentional ignorance, if there was ignorance, should not be a basis for voiding the agreement; to do so would allow her to profit from her own neglect and would only

encourage others to enter into antenuptial agreements blindly.

Wife relies heavily on the *Kosik* case to support her position. There, the parties were married only eight days after their first date. The wife had virtually no time to think over the agreement she was asked to sign, and she had not been advised to see a lawyer before signing the antenuptial agreement. Furthermore, she was completely unaware of Mr. Kosik's holdings. 253 Or at 17. This case is much closer factually to *Coward and Coward, supra.* Consistent with that case, we hold that the antenuptial agreement is valid.

Reversed and remanded for further proceedings not inconsistent with this opinion.[3] Costs to appellant on the appeal. No costs to either party on the cross-appeal.

**WARREN, J.,** dissenting.

The majority correctly points out that the relationship between these parties is fiduciary in character. *Kosik v. George,* 253 Or 15, 452 P2d 560 (1968); *Norris and Norris,* 51 Or App 43, 48, 624 P2d 636, *rev den* 291 Or 151 (1981). The fiduciary relationship results from the nature of the confidential relation between persons contemplating marriage and not dealing at arms' length. *Newton v. Pickell et al,* 201 Or 225, 230, 269 P2d 508 (1954).

> "A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Starkweather v. Shaffer,* 262 Or 198, 205, 497 P2d 358 (1972).

The majority is also correct that, between persons contemplating marriage, an antenuptial agreement will be upheld when there has been

> "* * * a full and frank disclosure of all circumstances materially bearing on the contemplated agreement, generally including full disclosure of assets:

---

[3] Although this court's review is *de novo,* we choose to remand this case rather than modify the property division ourselves. Having invalidated the antenuptial agreement, the trial judge based his decree on an erroneous premise, which accordingly tainted the property division. Now that the status of the agreement has been determined, we find it appropriate in this case to remand, thus allowing the trial judge to make a different property division consistent with this holding.

> " 'The exercise of good faith necessitates disclosure by the prospective husband of all material facts relating to the amount, character and value of his property, so that the prospective wife may have sufficient knowledge on which to base her decision to enter into the agreement.' 2 Lindey, Separation Agreements and Ante-Nuptial Contracts 90-43, § 90 (1967) and many cases cited thereunder." *Bauer v. Bauer,* 1 Or App 504, 507-08, 464 P2d 710 (1970).

Antenuptial agreements are looked on with favor, but that is not to say that they should be upheld when the party relying on the agreement to exclude a spouse from participation in the marital estate has not made the disclosure the law requires. One who is in a position of trust as a fiduciary must discharge his obligation himself. He may not excuse himself by claiming that the spouse could have informed herself or have better protected herself had she sought the advice of a lawyer.

The trial judge correctly concluded that husband had an affirmative duty to inform wife fully regarding the consequences of executing the agreement proffered to her, in accordance with *Kosik v. George, supra,* 253 Or at 23. Having heard the testimony of the parties, he concluded that the agreement was invalid because husband, by his own admission, did not fulfill that duty. Husband's own evidence as to what he explained to wife was wholly inadequate in my judgment to satisfy his duty of full disclosure. Husband testified:

> "I explained to her my situation that the stuff that I have I would like to preserve for my children and also that I would hold her harmless of any debts on things that would come out of the business."

He recalls no further discussion with her as to the content or terms of the agreement. He did not testify that he explained to her the amount, character or value of his assets. I would conclude that, under these facts, husband did not adequately inform wife of all circumstances materially bearing on the contemplated agreement.

The majority says in effect that it was not necessary for husband to inform wife about his property, because she was familiar with all aspects of his businesses and handled the bookkeeping and payroll and was in charge of ten business

checking accounts. The majority's statement that she was familiar with every aspect of husband's businesses is unsupported by the record. It may be conceded that she knew something, perhaps a great deal, about his business. That is not to say, however, that she knew all the material facts regarding the amount, character and value of his property.

Not only does husband's testimony about what he told wife concerning his property and the agreement fail to make out the required disclosure, the agreement itself fails to do so. The agreement consists of seven pages of legalese that essentially boils down to "what's mine is mine, what's yours is yours." It says nothing about the nature or value of his property.

I agree with the majority when it says that wife cannot intentionally fail to read the agreement and later claim that she was not fully informed about its contents. I point out, however, that she may not be charged with more knowledge than the agreement would have imparted to her had she read it. In other words, if the agreement was sufficient to satisfy husband's legal duty to make a full and fair disclosure, she could be held to have read and understood it. However, I conclude that, had she read the agreement, it would not have given her the information necessary to satisfy the requirements of *Bauer v. Bauer, supra,* that a disclosure be made of all material facts relating to the amount, character and value of husband's property.

Likewise, the failure of wife to take her husband's attorney's advice to see a lawyer of her own does not absolve husband of his affirmative duty as a fiduciary. Although wife may have been improvident in failing to seek legal advice and, although in a case of a marginally adequate disclosure that factor could be weighty, *see Coward and Coward,* 35 Or App 677, 680, 582 P2d 834 (1978), the disclosure here was not marginally adequate. It is precisely because a relationship of trust and confidence exists between persons contemplating marriage that they might not take the precaution to protect themselves that they would take in an arms' length transaction with a stranger. It is precisely because there is an emotional bond of trust between persons contemplating marriage that they may not read agreements dealing with the

property of their future spouse or consult attorneys concerning the legal implications of agreements regarding property. It seems unreasonable to me to fault wife for failing to take a potentially adversary position with her future husband. That is the reason the law requires a person who makes a contract with one to whom he has a fiduciary relationship to act in the interest of the one entitled to repose confidence.

As the majority states, the validity of this agreement depends on the circumstances of the particular case and the degree of sophistication possessed by the parties. This is not a case where "both [parties] were experienced business people and each possessed substantial assets." *Merrill v. Merrill,* 275 Or 653, 657, 552 P2d 249 (1976). The trial court found that, at the time of the parties' marriage, wife had a net worth of approximately $8,000 and husband had a net worth of $1,926,000 or $1,140,000. The record reveals that at the time of the marriage husband was 41 years old, had been married three times before this marriage and had an employment history of myriad different jobs, including budget manager for Goodyear Rubber Co. for the Willamette Valley, owner and operator of an outdoor and hardware store, restaurants, taverns and the Bend Airport, and extensive experience in the construction business. Wife was 30 years old at the time of the marriage, had been married once before and had worked for 12 years as a dental assistant in Portland before moving to Bend. Under these facts, I would hold husband strictly to the standard of good faith as a fiduciary in a case where, as in this one, only he stood to gain. His offer to hold wife harmless for his business debts, given the minimum assets wife had, is not over generous.

In summary, I would conclude that there is no evidence that, through her participation in husband's business as a bookkeeper, wife acquired sufficient knowledge of the value of his assets to excuse the duty to make a full disclosure. Husband's testimony as to what he orally communicated to her concerning the agreement was insufficient to satisfy the disclosure required by law (not by chivalry) of a fiduciary. Wife's failure to read an agreement that, if read, would not satisfy that duty, does not aid husband, nor does the fact that wife failed to seek an attorney bar her from participating in the marital assets.

Having found the agreement void, the trial court concluded that an equitable award was to give wife 12 percent of the parties' remaining assets,[1] in addition to the amount of $6,200, which was her specific contribution to the marriage, and distributed the marital assets accordingly. I would affirm.

---

[1]The trial court found that the parties suffered heavy losses during the marriage and that, by January 31, 1982, their net worth was approximately $191,700.