Argued and submitted June 14, the decision of the Court of Appeals affirmed and the judgment of the trial court as modified by the Court of Appeals affirmed September 6, reconsideration denied October 26, 1989

In the Matter of the Marriage of

STICE,
*Petitioner on Review,*
*and*

STICE,
*Respondent on Review.*

(TC CV87-0424; CA A47952; SC S35939)

779 P2d 1020

James M. Brown, Salem, argued the cause for petitioner on review. With him on the petition were Harold S. Harding, Corvallis, and Enfield, Guimond & Brown, Salem.

Larry W. Stuber, Corvallis, argued the cause for respondent on review.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

ORS 107.105(1)(f) provides in part:

"Whenever the court grants a decree of marital annulment, dissolution or separation, it has the power further to decree as follows:

"* * * * *

"For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. * * * The court shall consider the contribution of a spouse as a homemaker as a contribution to the acquisition of marital assets. There is a rebuttable presumption that both spouses have contributed equally to the acquisition of property during the marriage, whether such property is jointly or separately held."

The only issue in this dissolution of marriage case concerns the distribution of 1,567 shares of corporate stock acquired by wife during the marriage through monthly deductions from her salary.[1] The parties have agreed to equal distribution of all their other real and personal property.

The trial court awarded wife 78 percent of the disputed stock, resulting in her receiving about 71 percent of the value of the parties' property. The Court of Appeals modified the trial court's judgment, awarding each party half of the parties' property. *Stice and Stice,* 94 Or App 434, 765 P2d 246 (1988). We allowed review to consider whether the disputed stock is property subject to the presumption of equal contribution and, if so, whether wife had rebutted the presumption. On *de novo* review, we affirm the Court of Appeals.

The parties were married in 1962 and separated in 1987. They have no children. Wife, age 45, is a high school graduate and in good health. Husband, age 55, is also in good health. He earned a college degree prior to the marriage.

Throughout the marriage, both of the parties were employed by Teledyne Wah Chang in Albany. Husband, a

---

[1] For the rest of this opinion, we will refer to the stock in issue as the "disputed stock." The parties' total stock holdings consist of the disputed Teledyne stock which wife purchased through her payroll deductions; Teledyne stock husband received from Teledyne as bonuses; stock in two other corporations that wife and husband received as dividends on their respective Teledyne stock; and mutual fund shares held jointly.

chemist, started working there in 1959. Wife, who works in the chemistry lab, started in 1962. During most of the marriage, husband received a slightly higher salary than wife although she routinely worked overtime and he did not. Their current salaries, fringe benefits, and vested pension plans are comparable. Each intends to continue working at Teledyne until retirement. The parties have identical IRAs, each valued at about $14,000.

From the beginning of the marriage, the parties maintained separate checking accounts, and each contributed to their common expenses. Wife also had a savings account. Each of the parties had income remaining after common expenses. Both maintained separate checking accounts until 1983, when each added the other as a joint owner of his and her account. At that time, wife also closed her savings account and opened a joint savings account with husband. Thereafter, until the parties separated in 1987, wife wrote a few checks on his account to pay bills, and both parties made deposits in and withdrawals from their joint savings account. Essentially, however, they continued to manage their accounts separately, with each contributing to their common expenses and each using any remaining income as he or she saw fit. The parties have always filed joint state and federal income tax returns.

After the parties married, they rented a house. They subsequently purchased a house, and husband made the majority of the payments on that house. Later, using their first house as a down payment, they purchased a second house, their current family home in Albany. Husband also made the majority of the payments on that house. In 1973, the parties purchased a house in Lincoln County using money wife had saved. In 1978, using that house as a down payment, they purchased a house in Waldport. Wife made the majority, if not all, of the payments on that house. All the parties' real estate was jointly owned; both parties were obligated on the notes and mortgages; and both paid real property taxes.

During the marriage, the parties purchased about a dozen vehicles, using various payment methods. Husband paid for some; wife paid for others; and some were paid for from their joint savings account. All vehicles were titled and registered in both names. Sometimes she would pay for gasoline and maintenance; other times he would pay. Both paid for car insurance.

The disputed stock consists of 1,567 shares of Teledyne stock acquired by wife in her sole name between 1967-76 through monthly payroll deductions to Teledyne's employee stock plan. In all, she paid $10,296 for the stock, which, due to Teledyne's stock-matching policy, stock splits, and appreciation in value, is now valued at over $400,000. Husband holds in his name about $72,000 in Teledyne and related stock he received from Teledyne as bonuses. Husband also purchased other stocks, which, in the words of the trial court, "didn't pan out." The parties also jointly own some mutual fund shares; it is not clear, however, whether husband, wife, or both, purchased those shares. The total marital estate is valued at $761,222.

In the trial court, wife contended that the stock held in each of the parties' sole names should be considered separate property, that she should receive the stock in her name, that husband should receive the stock in his name, and that the balance of their marital assets should be divided equally. Husband contended that all the parties' property, including the disputed stock, should be divided equally.

Husband and wife were the only witnesses at trial. She testified that virtually all the parties' property had been accumulated during the marriage; that she purchased the disputed stock with her separate funds over husband's objections and that the disputed stock has always been held in her sole name; that husband spent his excess money on hunting and fishing trips, daily use of alcohol, and gambling; that in addition to working full-time at Teledyne, she did "the majority" of the housework and hired others to do the house and yard maintenance; that she had paid for most of the furniture, major appliances, groceries, and some of the utilities on the family home; that she had saved money to purchase the parties' first house in Lincoln County, which they later traded for their present house in Waldport; and that she had paid the mortgage and most of the utilities on that house. She estimated that during the marriage she had paid 60 to 70 percent of the parties' common expenses and that husband had paid between 30 to 40 percent; she acknowledged, however, that she had not totaled husband's checks.

Wife testified further that in 1987 she had deposited $6,268 in dividends on the disputed stock in the parties' joint

savings account; that she had written checks on husband's checking account "a couple of times" to "finish up bill paying"; that husband frequently gambled at the Elks Club; that the parties went together to Reno, "not on a regular basis, but we would go — some years we wouldn't go at all, and some years we would go like a couple of times in a year"; and that while in Reno, both gambled, wife playing slot machines and keno. She provided no specifics about husband's winnings or losses at the Elks Club or about their winnings or losses on their trips to Reno. She testified that to her knowledge, husband had never gone to Reno without her. In the last few years before their separation, the parties ate out together three times a week.

Concerning the disputed stock, wife testified:

"Q. There was some comment in the opening statement about considering these shares to be jointly held. Do you by a common agreement or practice consider these to be jointly owned stock?

"A. Did I not consider them and I didn't [sic]. *When I first purchased — started to purchase them and then toward the end of the Teledyne program,* being able to purchase the stock through the payroll deduction, *then there really was not much discussion,* but then when I would — anything came out about stock and I would say something about my stock, *he would* get mad and *say well those are our's* [sic], and it never was his stock.

"Q. Did you also stand by the principle that those were your separate stocks?

"A. Yes, because I wasn't allowed to have money for anything else. It's the only thing that I ever purchased or had for myself.

"Q. *Was there ever any agreement that these were joint or common stocks?*

"A. *No.*" (Emphasis added.)

Husband saw things differently. He testified that during 1967-76, while wife was purchasing the disputed stock, he had spent $56,157 on common expenses; that during the marriage he had paid 70 to 75 percent of the parties' common expenses; that he had paid most of the mortgage payments and utilities on the family home in Albany; that he had paid income and property taxes, life and car insurance, vehicle

expenses (maintenance and gasoline), medical and veterinary expenses, vacations, dining out expenses, and furniture expenses; and that he had made payments on wife's Visa account and put money in the parties' joint savings account. He testified that wife had always had access to his checking account; that she had written checks on his account; that he had written checks to pay her expenses; and that "she did the same for me."

Concerning the disputed stock, husband testified:

"Q. What was the understanding about those stock — shares of stock at the time that you were determined to buy them?

"A. It was an investment opportunity and something over and above savings. We were taking a chance that it would pay more than a savings account which paid 45 [*sic*] percent, or somewhere in those days and we were basing our hopes on the fact that Teledyne was expanding and would continue to under the well known good management that they had. *We were going to use that money for our future, for our retirement if it went anywhere, pension plans were not available at that time and since then the pension plan has not amounted to much.*

"Q. Well, now —

"A. It's less. *It was for our future.*" (Emphasis added.)

He testified further:

"Q. Was there any — any other discussions later on that you folks followed the ups and downs of the Teledyne stock?

"A. Enthusiastically, yes. We were excited when they split and we got sick when the price was down. The price started at about $80 and went down to $10 a share, scared her to death. She wanted to sell it, went back up at about $30 and she wanted to sell it again. I said this was the time to buy, not sell, so we got a lot of shares at $99 when they were at that.

"Q. But you didn't buy anymore shares at that time?

"A. No, we didn't buy anymore at any time after the plan terminated."

He also testified:

"Q. You heard her indicate that she felt that they were always her own. What was your opinion of the shares that were purchased under the offer from Teledyne?

"A. *Well, I felt, and we both felt, that they were ours for our future use.* People like to get ahead in the world and we got lucky this time." (Emphasis added.)

Husband testified that he had encouraged wife to buy the disputed stock; that its cost had been deducted from her paycheck rather than from his, or from both, because at that time they could not afford deductions from both checks (he admitted, however, that he paid $2,520 for a sportscar two months after the stock program began); that he had agreed to pay a larger share of their common expenses; that the parties never had agreed that the disputed stock was wife's separate property; that he had not asked wife to put his name on the disputed stock because he saw no need to do so; and that the disputed stock was "always intended to be a retirement stock pile." He denied excessive gambling or excessive use of alcohol.

The trial court ruled that the disputed stock was marital property subject to the statutory presumption of husband's equal contribution. The court then stated in part:

"The Court is satisfied that each parties' [*sic*] stock must be considered a marital asset. *Although they generally kept separate accounts, the availability of each others [sic] income allowed [wife] to make this investment.* \* \* \* The Court is satisfied, however, that [wife] was the primary catalyst for the acquiring and holding of the [disputed] stock, and the Court will consider this \* \* \* in dividing the property.

"\* \* \* \* \*

"[Wife] has always been the saver and purchaser throughout the marriage. She saved from her earnings and purchased the furniture the parties have from those savings. When they originally bought a beach house in Waldport, it was purchased from her savings. [Husband] has generally been a spender, and he has used most of his income above that needed for the monthly expenses for his enjoyment and hobbies. The Court is satisfied that the [disputed] Teledyne and related stocks were accumulated through [wife's] industry and frugality. It was her interest and perseverance that allowed the parties to obtain the Waldport property that is being awarded to [husband]. *I am satisfied, however, that [wife] was able to do this with her income, because of the financial support she received from [husband] in paying the monthly bills.*

"The Court is satisfied that [wife] deserves most, if not all,

of the credit for the accumulation and holding of the [disputed] Teledyne and related stocks. I am satisfied that a fair and just division of the stock requires the Court to consider this factor. If the decision had been left to [husband], the parties would not have the stock today. She was the one interested in putting something aside, and doing without in order to save to accumulate property for the future. The Court considers [wife] as the primary source of the parties' stock holdings." (Emphasis added.)

The court made no specific factual finding that wife had rebutted the presumption of equal contribution by husband with regard to acquisition of the disputed stock or that husband had been guilty of misappropriation or "waste" of marital property. In recognition of "the nature of [wife's] contribution to the accumulation of the assets that are being divided," the court awarded wife 78 percent of the disputed stock, resulting in her receiving about 71 percent of the value of the parties' property. Husband appealed.

On appeal, the Court of Appeals stated that while wife's industry was "commendable," it did not rebut the presumption of equal contribution by husband. The court specifically found that the record did not support a finding that husband was guilty of misappropriation or waste of the parties' marital assets. The court held that "an equal division of property is appropriate here." 94 Or App at 437.

In this court, wife argues that she has rebutted the presumption of husband's equal contribution to the acquisition of the disputed stock and that the Court of Appeals failed to give sufficient weight to the trial court's determinations that throughout the marriage she had been the "saver and purchaser," that the acquisition of the stock had been the result of her "industry and frugality," and that husband had been a self-indulgent "spender" who "used most of his income above that needed for the monthly expenses for his enjoyment and hobbies."

ORS 107.105(1)(f) contains two terms that describe classes of property. The first term, "the real or personal property, or both, of either or both of the parties," describes the entire class of property within the dispositional authority of the court in a dissolution case. *See Pierson and Pierson,* 294 Or 117, 121, 653 P2d 1258 (1982). This, however, says nothing

about *how* the distribution should be made. *See Id.* at 121; *Engle and Engle,* 293 Or 207, 213-15, 646 P2d 20 (1982); *Haguewood and Haguewood,* 292 Or 197, 206-07, 638 P2d 1135 (1981). The term "real or personal property, or both, of either or both of the parties" describes a larger class of property than the term "marital assets" *infra* because it includes property owned prior to the marriage. *Pierson and Pierson, supra,* 294 Or at 122. Property may be subject to the dispositional authority of the court, yet not be a marital asset. *Pierson and Pierson, supra,* 294 Or at 122.

The second term, "marital assets," describes any real or personal property, or both, acquired by either of the spouses, or both, during the marriage. *Pierson and Pierson, supra,* 294 Or at 121-22; *Engle and Engle, supra,* 293 Or at 213-15. Marital assets include, but are not limited to, the value of a spouse's pension earned during the marriage, *Richardson and Richardson,* 307 Or 370, 769 P2d 179 (1989); property received as a gift by a spouse during the marriage, *Jenks and Jenks,* 294 Or 236, 656 P2d 286 (1982); property inherited by a spouse during the marriage, *Pierson and Pierson, supra;* corporate stock acquired by a spouse during the marriage, *Engle and Engle, supra;* a family business purchased during the marriage, *Haguewood and Haguewood, supra;* and property acquired by a spouse after separation but before dissolution, *Lemke and Lemke,* 289 Or 145, 611 P2d 295 (1980). The fact that property acquired during the marriage is in one spouse's sole name does not change the fact that it is a marital asset. ORS 107.105(1)(f); *Jenks and Jenks, supra,* 294 Or at 241; *Engle and Engle, supra,* 293 Or at 214-15.

Marital assets are subject to the statutory rebuttable presumption of equality of contribution and to the ownership provisions of ORS 107.105(1)(f).[2] *See Engle and Engle, supra,* 293 Or at 214-15. The presumption of equal contribution to the acquisition of property during the marriage may be overcome by a finding that the property was acquired by one spouse uninfluenced directly or indirectly by the other spouse,

---

[2] As respects property acquired during the marriage with money earned by a working spouse, the legislative history indicates that the meaning of the term "marital assets" contained in the third sentence of ORS 107.105(1)(f), and the meaning of the term "property," contained in the fourth sentence, are identical. *See Engle and Engle, supra,* 293 Or 207, 214-15, 646 P2d 20 (1982).

*i.e.,* the other spouse has contributed neither economically nor otherwise to the acquisition of the property in issue. *See Jenks and Jenks, supra,* 294 Or at 241; *Pierson and Pierson, supra,* 294 Or at 123; *Lemke and Lemke, supra,* 289 Or at 148 (presumption rebutted where parties, though still married, had led separate lives for 20 years).

Whether or not the statutory presumption of equality of contribution has been rebutted, ORS 107.105(1)(f) ultimately authorizes and requires courts to distribute any and all of the spouses' property, including separate property, "as may be just and proper in all the circumstances." *See Richardson and Richardson, supra,* 307 Or at 379-80; *Norris and Norris,* 302 Or 123, 127, 727 P2d 115 (1986); *Jenks and Jenks, supra,* 294 Or at 241-42; *Pierson and Pierson, supra,* 294 Or at 123-24. Because both spouses in this case contributed economically and otherwise to the acquisition of the marital assets, we need not now decide whether the parties' respective contributions to these assets during a 25-year marriage would play *any* role in making a "just and proper" distribution of the parties' property pursuant to ORS 107.105(1)(f).

■ OEC 308, which is applicable to marital dissolution cases, provides:

> "In civil actions and proceedings, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

The spouse disputing the presumption of equal contribution has the burden of proving by a preponderance of the evidence that it is more probable than not that the other spouse did *not* contribute equally to the acquisition of the property. OEC 308; ORS 107.105(1)(f).

This court has reviewed several cases in which a party has challenged the presumption of equal contribution. In *Jenks and Jenks, supra,* we found that the presumption had been rebutted because the property in issue was acquired by gift to the husband free from any finding that the gift was related to the wife's efforts or that she was an object of the donative intent. In *Pierson and Pierson, supra,* we found that the presumption had been rebutted because the property in issue was acquired by the wife's sole inheritance after the parties had separated and unaffected by the husbands efforts. In *Lemke and Lemke, supra,* we found that the presumption

had been rebutted because the property in issue was acquired by the husband after the parties had lead separate lives for 20 years. In *Richardson and Richardson, supra,* we found that the presumption had been rebutted in part as to that portion of the present value of the husband's pension which was earned solely by his efforts at a time when the parties were no longer living as a marital unit.

■   In a long-term marriage in which the parties' properties were acquired during the marriage, the parties should separate on as equal a basis as possible. *Engle and Engle, supra,* 293 Or at 219. *See Richardson and Richardson, supra,* 307 Or at 379; *Jenks and Jenks, supra,* 294 Or at 241; *Grove and Grove,* 280 Or 341, 349, 571 P2d 477 (1977). In *Jenks,* 294 Or at 242, we explained:

> "When couples enter marriage, they ordinarily commit themselves to an indefinite shared future of which shared finances are a part. Acquisitions are made, foregone or replaced for the good of the family unit rather than for the financial interests of either spouse. Property is bought, sold, enhanced, diminished, intermixed and used without regard to ease of division upon termination of the marriage. All this may be modified by agreement, of course, but, by the nature of the marital relationship, couples ordinarily pledge their troth for better or worse until death parts them and their financial affairs are conducted accordingly.

> "If the marriage is terminated before the parties' financial affairs become commingled or committed to the needs of children to the point that the parties cannot readily be restored to their pre-marital situations, then property division is a relatively simple task in the nature of a rescission. *See York and York,* 30 Or App 937, 569 P2d 32 (1977). That, rather than any specific number of months or years, is what we mean by a 'short-term marriage.' With each common financial act or decision, however, the finances of the parties may become more interrelated, and extrication upon dissolution becomes increasingly difficult. The origin of each item becomes less significant in the overall task of making a property division which is 'just and proper in all the circumstances.' "[3]

---

[3] In *Glatt and Glatt,* 41 Or App 615, 622, 598 P2d 1237 (1979), the present Chief Justice of this court, then sitting as a Court of Appeals judge *pro tempore,* wrote:

"In dissolution cases involving marriages of long duration, the courts have consistently been less concerned with identifying the relative contributions of the parties than they have been with ensuring that the parties separate on as equal a

■    In fulfilling the statutory mandate to distribute "the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances," courts may consider any special circumstances that might dictate unequal division of the parties' property. ORS 107.105(1)(f); *see Richardson and Richardson, supra,* 307 Or 379-80; *Norris and Norris, supra,* 302 Or at 127; *Jenks and Jenks, supra,* 294 Or at 241-42; *Pierson and Pierson, supra,* 294 Or at 123-24.

■    The trial court correctly found that the disputed stock was marital property. We proceed to consider whether wife rebutted the presumption of equal contribution by husband. We conclude that she did not. Throughout their marriage the parties commingled their financial affairs. Both incomes were used to purchase marital assets, to pay marital debts, and to support the parties' standard of living. The trial court stated:

> "[A]lthough they generally kept separate accounts, the availability of each others' income allowed [wife] to make this [stock] investment," and "[Wife] was able to [acquire the Waldport beach property] with her income because of the financial support she received from [husband] in paying the monthly bills."

Furthermore, we find no agreement or common understanding between the parties that the disputed stock was to be wife's separate property. Although the trial court stated that she was saving and investing for the future, it did not suggest, much less find, that she was saving only for *her own future,* and not for the parties' *common future.*

    Wife's argument that husband's pursuit of his enjoyment and hobbies was, in effect, a "waste" of marital assets is

---

basis as possible, under the circumstances. This is particularly appropriate where, as here, both parties worked throughout the marriage and made significant financial contributions to the accumulation of assets. We generally grant one party a 'long half' only if there are circumstances such as poor health or significantly lower earning capacity which make such a distribution appropriate. Here, both parties are able to work and have good jobs. While wife earns approximately $400 less gross per month than husband, both receive self sufficient salaries. Under the circumstances of this case, we believe each party should receive as close to half the value of the assets as possible. In light of the amount of property involved and the income earning ability of each party, an equal division will leave both parties in a healthy financial condition." (Citations omitted.)

not supported by a preponderance of the evidence in the record. She offered little evidence at trial about his life style, and the trial court made no specific factual finding concerning her allegations that he had been prodigal. Based on our independent review of the record, we agree with the Court of Appeals which found that "Such facts are not present here." *Stice and Stice, supra,* 94 Or App at 437.

■        We do not find the ORS 107.105(1)(f) "homemaker" provision relevant to the facts of this case. The legislative history of the statute indicates that the provision primarily was intended to recognize that "non-earning spouses who maintain the home, do the cooking and cleaning and raise the children, also contribute to the acquisition of property in a tangible way." *See Jenks and Jenks, supra,* 294 Or at 241; *Pierson and Pierson, supra,* 294 Or at 122; *Engle and Engle, supra,* 293 Or at 213-15. In the context of ORS 107.105(1)(f), the legislative mandate to consider a homemaker-spouse's contribution serves to reinforce the statutory presumption that both parties to a marriage contribute equally to the acquisition of property during the marriage. The provision effectively places the homemaker-spouse's non-economic contributions on a par with the breadwinner-spouse's direct economic contribution to the acquisition of property.

We find no legislative intent, however, that when a spouse works outside the home and, additionally, performs "homemaker" duties, she or he should be able to rely upon the homemaker provision to establish that she or he contributed *more* than 50 percent to the acquisition of property during the marriage. We conclude that the homemaker provision may be applied only to support the presumption of *equal* contribution; it may not be used by a "breadwinner-homemaker-spouse" to rebut the presumption of equal contribution by the other spouse. For that reason wife's testimony that she did "the majority" of the homemaking, even if true, could not by itself support a finding that she had contributed more than equally to the acquisition of the parties' property.

In sum, during 25 years of marriage, with each common financial act or decision, the parties' finances became increasingly interrelated, and the origin of each marital asset became less significant to the task of making a just and proper property division. *See Jenks and Jenks, supra,* 294 Or at 242.

As did the Court of Appeals, we conclude that wife has not rebutted the presumption of husband's equal contribution to the acquisition of the disputed stock.

■ We next consider whether wife has shown any special circumstances justifying a departure from the general rule that the parties to a long-term marriage should separate on as equal a basis as possible. *Engle and Engle, supra,* 293 Or at 219. As noted, wife and husband are both in good health. They are employed by the same employer and their current salaries, fringe benefits, and vested pension plans are comparable. Each intends to continue working at Teledyne until retirement. She is 10 years younger than he. There are no marital debts. Thus, each party can expect to have an equivalent standard of living after dissolution. There are no children and, thus, no need for an unequal division of property to a custodial parent for the benefit of children. We conclude that there are no special circumstances present that would justify wife receiving more than an equal share of the parties' property and that the Court of Appeals' division, therefore, is "just and proper under all the circumstances."

The decision of the Court of Appeals is affirmed. The judgment of the trial court as modified by the Court of Appeals is affirmed. Costs to neither party.