On petition for review filed November 1, 1989, petition for review denied April 3, 1990

In the Matter of the Marriage of

**LEATHERS,**
*Respondent on Review,*

*and*

**LEATHERS,**
*Petitioner on Review.*

(TC 86-1-371; CA A46768; SC S36642)

789 P2d 263

Lee Aronson, Portland, for petitioner on review. With him on the petition were William F. Schulte, Jr., and Schulte, Anderson, DeFrancq, Downes & Carter, P. C., Portland.

Charles F. Adams, for respondent on review. With him on the response were Stoel, Rives, Boley, Jones & Grey and James R. Cartwright, Portland.

Van Hoomissen, J., dissented and filed an opinion.

## VAN HOOMISSEN, J.

I respectfully dissent from this court's denial of review.

This case involves the validity of the parties' prenuptial agreement.[1] Husband appealed the trial court's judgment, complaining that the court failed to give proper effect to the prenuptial agreement. He argued that, except for the property that wife would receive pursuant to paragraph 2 of the agreement, paragraph 7 of the agreement precluded her from asserting any interest in any property he acquired in any capacity whatsoever either before or during the marriage.

Wife cross-appealed, complaining that the trial court

---

[1] The pertinent portions of the prenuptial agreement are:

"1. It is understood and agreed that [wife] has, as of the date of this instrument, cash and assets in the sum of [$6,000]. It is further understood and agreed that [husband] has earned and accumulated over the years prior to this agreement substantial assets, holdings and interest in real and personal property principally through his efforts and business endeavors in the marketing of petroleum products.

"2. It is the intention of this agreement that, in the event of a termination of the contemplated marriage by a decree of divorce, the distribution of assets in such event shall be in accordance with the terms and provisions of this agreement, and that [husband] shall convey, transfer and pay over to [wife] the following assets:

"(a) The accumulated equity of the parties in their home property;

"(b) A sum equal to the aforementioned sum of [$6,000] as the return to [wife] of the value of assets she owned as of the date of this agreement;

"(c) The family automobile, free and clear. If there would be more than one family automobile at the time of such termination of this marriage, it is understood and agreed that [wife] shall receive the automobile of her choice, free and clear;

"(d) The household furniture and furnishing owned by or being purchased by the parties and used by them in their family residence, free and clear.

"3. It is specifically understood and agreed that the aforementioned assets constitute a full and fair settlement of the rights and claims of [wife] in the event of a termination of the contemplated marriage, and that said assets shall be the sum total of [wife's] claim against [husband], and that upon conveyance, transfer and payment by [husband] to [wife] of said assets and sums, all obligations of [husband] arising from the marital relationship shall cease and determine [sic].

"* * * * *

"7. [Wife] hereby waives, disclaims and releases all right, title and interest in and to any and all real and personal property owned or possessed by [husband] at the time of their marriage, save and except the interest of [husband] in [his home property], or that he may hereafter acquire by any means whatsoever, save and except the subsequent purchase or acquisition of any real property which shall be used by the parties as their home property."

should have voided the prenuptial agreement. She argued that the agreement was unenforceable because she had not had an adequate opportunity to seek independent counsel regarding the agreement's effect before signing it, because husband's attorney gave her incorrect advice as to the agreement's duration and legal effect, and because there was no "meeting of the minds" by the parties as to the agreement's duration and legal effect.[2]

This was a 22-year marriage. The parties became romantically involved in 1959 when wife was 21 years old and husband was 34. Both had been previously married, and wife had two young children from her first marriage. Wife apparently began actively participating in husband's business about 1960, although she also was employed elsewhere.

The marriage was planned for March 25, 1965. At the time the prenuptial agreement was executed, wife had quit her job and had moved with her children into a home purchased by husband in anticipation of the marriage.

Sometime in March 1965, husband's attorney, Lock, with whom wife was acquainted, prepared a draft prenuptial agreement which husband approved. Although the parties had discussed the possibility of a prenuptial agreement about two years before the marriage, husband did not present the prenuptial agreement at issue here to wife until the evening of March 24, shortly before the parties were to drive to Reno, Nevada, where they were to be married the following day.

Upon receiving a copy of the agreement, wife telephoned attorney Lock seeking advice about its legal effect. Wife testified that Lock told her that the intent of the agreement was to protect the property husband was bringing into the marriage; that the agreement would have no legal effect if the parties remained married for more than a few years; and that the agreement did not apply to property acquired after

---

[2] The trial court specifically found both parties credible, although their recollections differed on a number of points. That is understandable in view of the fact that the recollected events occurred at the beginning of the parties' 28-year relationship. None of the differences appears to me to be dispositive. Because the trial court specifically found both parties credible, and because there does not appear to be any important difference in the evidence presented by the parties, I find no compelling reason to accord deference to the trial court's decision based on its opportunity to hear and observe the parties and their witnesses.

their marriage. Apparently, Lock did not deny wife's testimony on those points.

Wife also testified that Lock did not advise her to seek independent counsel. Lock testified that he had no specific recollection of having advised wife to seek independent counsel but that his "habit" would have been to give such advice.

The trial court found that wife had read the prenuptial agreement, and that she "fully understood its effect and terms." The court concluded that the prenuptial agreement was valid.

The Court of Appeals stated:

"The trial court found that wife was a sophisticated person, capable of understanding the importance of legal documents and, specifically, the impact that an prenuptial agreement could have in the event the marriage were later dissolved."[3] *Leathers and Leathers,* 98 Or App 152, 157, 779 P2d 619 (1989).

It is difficult for me to perceive how the courts below could have concluded that wife understood the prenuptial agreement when she thought its duration to be short term, and 22

---

[3] The Court of Appeals found:

"After the parties married, wife began working full time in husband's business, Leathers Oil Company. She drew no salary for her work, but both parties used company accounts to pay their personal expenses. Husband testified at trial that he considered wife to be the head of the office when he was away on business. Several employees of the company testified that it was their impression that the parties were operating the business together. Throughout the marriage, most of the properties purchased for Leathers Oil were purchased in the names of both parties. Two years after the marriage, wife asked husband why her name was not on one of the properties being purchased for the company, and husband responded that it was because she was part of Leathers Oil Company and title was being taken in the company's name. Approximately four years after the marriage, apparently at the time for renewal of the company's assumed business name registration, the name of the company was changed from Carl Leathers, dba Leathers Oil Company, a sole proprietorship, to Carl and Lila Leathers, dba as Leathers Oil Company, a proprietorship of husband and wife.

"The parties' business enterprise expanded rapidly during the marriage, with its total net worth growing from approximately $430,000 at the date of marriage [in 1965] to over $12 million the date of the dissolution judgment [in 1988]." *Leathers and Leathers,* 98 Or App 152, 155, 779 P2d 619 (1989).

years later the courts below have found it valid and enforceable.[4]

The trial and appellate courts then reasoned that because the parties had operated the family business for 22 years as a partnership, the prenuptial agreement did not affect wife's "partnership rights." The courts concluded that property acquired jointly, held jointly or treated as joint property was exactly that, and that wife was entitled to her undivided one-half interest in such "partnership" property. This case should not have been decided on a partnership theory, but on well-established principles of family law. *See* ORS 107.105; *Stice and Stice* 308 Or 316, 779 P2d 1020 (1989).

In finding an agreement executed in the circumstances here to be valid, the Court of Appeals has set a low standard for the conduct of fiduciaries and their counsel. I believe the Court of Appeals' decision is inconsistent with our statutes and case law, and I would allow review for that reason.[5]

Oregon law recognizes the validity of prenuptial agreements. ORS 108.700 *et seq.* The Court of Appeals' decision in this case departs from Oregon statutes and prior decisions of this court that recognized and enforced the fiduciary

---

[4] Neither the trial court nor the Court of Appeals addressed attorney Lock's apparent conflict of interest, or the misinformation Lock gave wife as to the duration of the prenuptial agreement and its legal effect.

[5] "Premarital agreements are gaining popularity as more people become conscious of the extensive financial rights and obligations arising out of a marriage, and the increasing statistical chance that any marriage will end in divorce. Also called 'antenuptial' or 'prenuptial' agreements, these spell out *before* the marriage how the parties will deal with their respective acquisitions during the marriage and in the event of divorce. Usually in writing and often notarized, premarital agreements generally are covered by the statute of frauds within most states.

"As a general rule, the more intensively the premarital agreement is negotiated by the parties - complete with independent counsel for each party and express documentation to show the bargaining back and forth for each material term - the more likely the agreement is to withstand an accusation of fraud, duress, or undue influence.

"The ultimate irony is that the ideal premarital agreement from a standpoint of enforceability may require the parties to engage in such adversarial negotiations that they probably will decide not to marry. *On the other hand, premarital agreements first mentioned an hour before the wedding, with the affluent spouse-to-be telling the other, to 'just put your trust in me,' and signed without further comment, usually are not worth the paper on which they are written, whether or not indelible ink is used.*" 12 ABA Family Advocate, No. 3, 54-55 (Winter 1990). (Emphasis supplied.)

relationship between the parties to a marriage and required full and fair disclosure and understanding of prenuptial agreements prior to their execution.[6]

Persons who are engaged to each other share a confidential relationship which imposes fiduciary duties in transactions between them. *Merrill v. Merrill,* 275 Or 653, 656, 552 P2d 249 (1976); *Kosik v. George,* 253 Or 15, 22, 452 P2d 560 (1969). They are required to deal with the utmost good faith and disclose all circumstances materially bearing upon any contemplated prenuptial agreement. *Kosik v. George, supra,* 253 Or at 22. Furthermore, ethical rules prohibit attorneys from representing potentially conflicting interests (except in very limited circumstances and after full disclosure). Independent counsel for each party to a prenuptial agreement is strongly recommended because the interests of the parties to a prenuptial agreement are frequently adverse.[7]

The parties had never discussed the specifics of the prenuptial agreement. Husband, who sought and approved the agreement, never advised his prospective wife of its consequences or of her rights in the absence of the agreement. Husband presented the agreement to wife after business hours on the eve of her wedding, only a short time before they were to drive to Reno to be married. As a practical matter, wife had no time to consult independent counsel. She had committed her family's future to the marriage by quitting her job and moving with her two young children into a home acquired by husband in contemplation of their marriage. If the marriage did not take place, her financial condition and her childrens' future would be precarious. She had been involved with husband for several years and, it is reasonable to assume, was anxious that there should be no impediment to the marriage.

Husband's attorney, Lock, assured wife, incorrectly it seems, that the agreement would have no legal effect should the marriage last more than a few years, and that the agreement only affected property husband was bringing into the

---

[6] *See* ORS 108.700 *et seq; Merrill v. Merrill,* 275 Or 653, 552 P2d 249 (1976); *Reiling and Reiling,* 256 Or 448, 474 P2d 327 (1970); *Kosik v. George,* 253 Or 15, 22, 452 P2d 560 (1969); *Taylor v. U. S. National Bank,* 248 Or 538, 436 P2d 256 (1968); *Moore v. Schermerhorn,* 210 Or 23, 307 P2d 483, 308 P2d 180 (1957).

[7] *See Bauer v. Bauer,* 1 Or App 504, 464 P2d 710 (1970).

marriage, but not property acquired after the marriage. There is no evidence that Lock or husband advised wife about her right to spousal and/or child support in the event of a dissolution, about the effect the agreement might have on any will either of the parties had executed before or would execute during the marriage, about any statutory, common-law and other rights as a wife she was releasing and waiving, or about any estate consequences to her or to her children in the event of the death of either of them. There is no indication that she was advised about any other implications of the agreement to her children, or about any tax consequences of the agreement.

This premarital agreement probably would be an adhesion contract in the business arena under analogous circumstances: it is lopsided, between parties of greatly different bargaining power, and presented for execution down the barrel of a premarital shotgun. Surely the fiduciary relationships of the parties in this case demand a higher standard of conduct than a business relationship and than that apparently approved by the lower courts here. I would allow review to make this principle clear.