Argued and submitted March 18; resubmitted In Banc December 11, reversed and remanded in part; otherwise affirmed December 24, 1996, petition for review allowed April 8, 1997 (325 Or 247)
See later issue Oregon Reports

In the Matter of the Marriage of

Samuel Jonathon DENTON,
*Appellant,*
*and*

Edna Fleischmann DENTON,
*Respondent.*

(93C-35739; CA A86943)

930 P2d 239

In Banc*

Russell Lipetzky argued the cause for appellant. With him on the briefs was Saucy & Lipetzky, P.C.

William C. Crothers argued the cause for respondent. With him on the brief was Crothers & Hansen, P.C.

---

* Edmonds, J., not participating.

LANDAU, J.

Riggs, J., dissenting.

## LANDAU, J.

Husband appeals a dissolution judgment that awarded wife, among other things, $15,000 per year as payment for her contribution to his "enhanced earning capacity," $2,000 per month indefinite spousal support and a portion of the parties' real estate and other holdings. Husband assigns error to the enhanced earning capacity award, to the award of spousal support and to the valuation of his business, which was a predicate to the distribution of the marital property. On *de novo* review, ORS 19.125(3), we conclude that the facts of this case do not justify an award for enhanced earning capacity, that the trial court's award of indefinite spousal support is not warranted under the circumstances and that the valuation of husband's business was correct.

The parties were married for 14 years before they separated in 1990. They had lived together for a few years before they married. At the time of trial, both husband and wife were 45. They had no children.

At the beginning of the marriage, wife had a high school education and worked as a licensed practical nurse (LPN). Husband had a bachelor's degree in zoology and a master's degree in wildlife ecology. He continued his graduate studies and worked part time. In 1978, husband entered medical school. During medical school, husband received loans, grants and scholarships that more than paid for his educational expenses. During that same time, however, wife continued working as an LPN. Upon completion of medical school, husband took a one-year paid internship, during which time his income was comparable to that of wife's. The following year, he took a staff position at a local hospital, where his income doubled; wife, meanwhile, cut back on her hours of work.

In 1984, husband took a residency in dermatology in Iowa. His income was large enough that wife could afford to attend school, so she attended a community college during the three-year residency and did not work outside the home. At the conclusion of the residency, the parties moved to Salem, and husband began his practice as a dermatologist.

Wife, meanwhile, continued going to school, first at a community college and later at Oregon State University. All educational expenses were paid out of the income from husband's practice. In 1988, husband became a shareholder in a dermatology clinic. Two years later, the parties separated. Wife continued her schooling, and in 1991, she graduated *magna cum laude* with a bachelor's degree in sociology. At the time of trial, in 1994, husband was earning $12,300 per month gross income from his salary and bonuses at the clinic. Wife was working only part time as a hospital clerk. By that time, the parties had accumulated substantial assets, including a home in Amity, a home in Salem, other real estate, a share of the dermatology clinic, cars, a boat, retirement accounts and personal property.

The trial court valued the assets and then divided them, awarding wife the Salem home free and clear of encumbrances, a car, $23,000 in cash, half of husband's retirement benefits and an equalizing judgment of approximately $121,000. The court awarded separately to wife an annual payment of $15,000 "on account of husband's enhanced earnings" for as long as husband continues to work. Finally, the court awarded wife indefinite spousal support of $2,000 per month.

■ Husband first assigns error to the trial court's award of an annual payment to wife to compensate her for her contributions to his enhanced earning capacity. According to husband, a court may order an award to compensate one spouse for contributions to the enhanced earning capacity of the other only upon proof that those contributions were "material," that is, were "to the education and training that resulted in the enhanced earning capacity" and were "substantial and of prolonged duration." ORS 107.105(1)(f). Husband argues that wife made no such contributions to his enhanced earning capacity. He already had acquired both a bachelor's degree and a master's degree before the parties married. Any enhancement of his earning capacity beyond that, he contends, resulted from his acquisition of a medical degree, to which wife made no material contributions. Husband points to the fact that he paid for his direct educational expenses by loans and substantial grants and scholarships.

He further points to the fact that wife made no career sacrifices on his behalf of any sort and that she was able to pursue any educational and career choices that she wished throughout the marriage.

Wife concedes that she did not contribute to husband's direct educational expenses. She further concedes that she was able to pursue all of her professional and academic goals during the marriage, that she did not work for husband at any time and that she was not compelled to forgo any employment or educational opportunities during the marriage. She nevertheless contends that she made material contributions to husband's medical education by working outside the home to help defray living expenses while husband went to school, by allowing husband to borrow her car, by occasionally drawing from her savings for sundry family expenses and by performing various domestic chores such as maintaining the home and tending to the family bills.

To determine whether wife is entitled to an award to compensate her for contributions to husband's enhanced earning capacity we must ascertain the meaning of ORS 107.105(1)(f), which provides, in part:

"(1) Whenever the court grants a decree of marital annulment, dissolution or separation, it has power further to decree as follows:

"* * * * *

"(f) For the division or other disposition between the parties of the real or personal property, or both, of either or both of the parties as may be just and proper in all the circumstances. * * * The court shall consider the contribution of a spouse as a homemaker as a contribution to the acquisition of marital assets. There is a rebuttable presumption that both spouses have contributed equally to the acquisition of property during the marriage[.] * * * The present value of, and income resulting from, the future enhanced earning capacity of either party shall be considered as property. The presumption of equal contribution to the acquisition of marital property, however, shall not apply to enhanced earning capacity. A spouse asserting an interest in the income resulting from an enhancement of earning capacity of the other spouse must demonstrate that the spouse made a material contribution to the enhancement.

Material contribution can be shown by, among other things, having contributed, financially or otherwise, to the education and training that resulted in the enhanced earning capacity. The contribution shall have been substantial and of prolonged duration."

In particular, we must determine whether the prior efforts on which wife relies constitute "material" contributions of a "substantial" nature and for a "prolonged duration."

■    We undertake that interpretive effort with the goal of ascertaining, if possible, the intention of the legislature by examining the text in context and, if necessary, the legislative history and other interpretive aids. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The "context" of the statute includes the preexisting common law and statutory framework within which the law was enacted, *Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 416-17, 908 P2d 300 (1995), *recons allowed* (July 23, 1996), including other statutes *in pari materia*, *State v. Carr*, 319 Or 408, 412, 877 P2d 1192 (1994), and prior versions of the statute, *Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994). We begin our examination of the statute by addressing each of those aspects of its context.

Oregon's current system of no-fault dissolution dates back to 1971. Since that time, the dissolution of any marriage has required the division of all "property" that the parties accumulated during their time together. When the parties accumulated real estate, personal property and other tangible assets, the division of marital property presented a straightforward question of valuation and equitable division in accordance with the statutory admonition to divide property in a manner that is "just and proper in all the circumstances." ORS 107.105(1)(e) (1971). Courts early on encountered difficulties, however, in fashioning "just and proper" divisions in two important respects.

First, there arose a question as to the basis on which to divide equitably the property accumulated during the marriage. With the advent of the no-fault divorce law, the courts focused not on the fault of one or the other of the parties but on the relative contributions to the marital partnership. Still, valuing the extent of the contributions of a homemaker

spouse proved difficult to establish. In response to that difficulty, in 1977, the legislature declared that such efforts are to be considered contributions to the acquisition of marital assets and created a statutory presumption that both parties—whether or not either works outside the home—have contributed equally to the acquisition of property during the marriage. ORS 107.105(1)(e) (1977).

Second, when faced with less tangible assets, such as the value of a professional degree or license or, more generally, the enhanced earning capacity of a spouse, questions arose as to whether those assets could be considered part of the marital property to which the statutory presumption of equal contribution applied. On the one hand, such intangible assets did not readily conform to common-law notions of "property," traditionally defined as something with an "exchangeable value."[1] And, not surprisingly, Oregon courts, along with the overwhelming majority of courts elsewhere in the country, expressed reluctance to recognize enhanced earning capacity as property to be divided upon dissolution. *See, e.g., Grove and Grove,* 280 Or 341, 357-58, 571 P2d 477, *modified* 280 Or 769, 572 P2d 1320 (1977) ("We do not, however, approve the allocation of future earnings on principles applicable to property rights.").[2] On the other hand, the

---

[1] The Colorado Supreme Court's decision in *In re Marriage of Graham,* 194 Colo 429, 432, 574 P2d 75, 77 (1978), is often cited as the leading case on the point. There, the court held that a professional license is not marital property, because "[i]t cannot be assigned, sold, transferred, conveyed, or pledged" and is "personal to the holder."

[2] For decisions of other state courts declining to award a share of a professional license, advanced degree or of enhanced earning capacity as property, see *Jones v. Jones,* 454 So 2d 1006, 1009 (Ala Civ App 1984) (law degree); *Wisner v. Wisner,* 129 Ariz 333, 339-40, 631 P2d 115, 121-23 (Ariz Ct App 1981) (medical license); *Hughes v. Hughes,* 438 So 2d 146, 150 (Fla Ct App 1983) (undergraduate degrees); *Inman v. Inman,* 648 SW2d 847, 852 (Ky 1982) (dental license); *Sweeney v. Sweeney,* 534 A2d 1290, 1291 (Me 1987) (medical license); *Archer v. Archer,* 303 Md 347, 357, 493 A2d 1074, 1079 (1985) (medical license); *Drapek v. Drapek,* 399 Mass 240, 244, 503 NE2d 946, 949 (1987) (medical license); *Scott v. Scott,* 645 SW2d 193, 197 (Mo Ct App 1982) (law license); *Mahoney v. Mahoney,* 91 NJ 488, 495-505, 453 A2d 527, 531-36 (1982) (MBA degree); *Haywood v. Haywood,* 106 NC App 91, 100, 415 SE2d 565, 570 (1992), *rev'd on other grounds* 333 NC 342, 425 SE2d 696 (1993) (master's degree); *Stevens v. Stevens,* 23 Ohio St 3d 115, 120, 492 NE2d 131, 135 (1986) (veterinary degree); *Hodge v. Hodge,* 513 Pa 264, 268, 520 A2d 15, 17 (1986) (medical degree); *Helm v. Helm,* 289 SC 169, 171, 345 SE2d 720, 721 (1986) (medical degree); *Wehrkamp v. Wehrkamp,* 357 NW2d 264, 266 (SD 1984) (dental license); *Beeler v. Beeler,* 715 SW2d 625, 627 (Tenn Ct App 1986) (dental license); *Frausto v. Frausto,* 611 SW2d 656, 659 (Tex Civ App 1980) (medical degree); *Martinez v. Martinez,* 818

capacity to earn additional income as a function of education and training acquired during the marriage clearly is not without value in an economic sense, and it appeared inconsistent with the statutory command to devise a "just and proper" disposition of marital assets to leave such a valuable commodity outside of the dissolution equation. In 1983, the legislature attempted to address that perceived inequity by including "[t]he contribution by one spouse to the education, training and earning power of the other spouse" as a factor that courts are to consider in setting an award of spousal support. ORS 107.105(1)(d)(C).

The use of spousal support to compensate a spouse for contributions to enhanced earning capacity prompted criticism that the remedy was incomplete at best. Among other things, critics noted, spousal support may not be available even to a spouse who has contributed to another's enhanced earning capacity if both spouses are currently capable of self-support. *See generally* Amanda Franz, Comment, *Disposition of a Professional Degree upon Dissolution of a Marriage: What Will Oregon's Solution Be?*, 20 Willamette L Rev 141, 166 (1984).[3]

Meanwhile, courts in at least two other states began to recognize the equitable necessity of awarding compensation to a spouse who has sacrificed his or her own educational or career opportunities for the enhancement of the earning capacity of the other spouse. The most celebrated of those cases was the New York Court of Appeals decision in *O'Brien v. O'Brien*, 66 NY2d 576, 489 NE2d 712, 498 NYS2d 743

---

P2d 538, 541-42 (Utah 1991) (medical degree); *Marion v. Marion*, 11 Va App 659, 668, 401 SE2d 432, 438 (1991) (veterinary degree); *Downs v. Downs*, 154 Vt 161, 165-66, 574 A2d 156, 158 (1990) (medical degree); *Hoak v. Hoak*, 179 WVa 509, 513, 370 SE2d 473, 477 (1988) (medical degree).

   [3] *See also* Cynthia Starnes, *Divorce and the Displaced Homemaker: A Discourse on Playing with Dolls, Partnership Buyouts and Dissociation Under No-Fault*, 60 U Chi L Rev 67, 97-106 (1993) (detailing limitations of rehabilitation alimony); Deborah A. Batts, *Remedy Refocus: In Search of Equity in "Enhanced Spouse/Other Spouse" Divorces*, 63 NYU L Rev 751, 767-71 (1988) (describing limitations of rehabilitative and reimbursement alimony); Scott E. Willoughby, Note, *Professional Licenses as Marital Property: Responses to Some of* O'Brien's *Unanswered Questions*, 73 Cornell L Rev 133, 136-37 (1987) ( alimony regarded as inadequate, because terminable upon remarriage and based on current need for support).

(1985). In that case, the court held that the husband's medical license was marital property and that the nonlicensed spouse was entitled to a distributive share of the increased earning potential that resulted from the license. The court justified its award on the basis of the wife's direct contributions to the husband's education expenses and the extent to which the wife had modified her own career plans to accommodate the husband's educational needs. *O'Brien,* 66 NY2d at 585-86, 489 NE2d at 716, 498 NYS2d at 747.[4]

In Oregon, however, courts continued to adhere to the view that enhanced earning capacity could not be considered a form of property to be divided upon dissolution and, instead, could be considered only in awarding spousal support. In *Stuart and Stuart,* 107 Or App 549, 813 P2d 49 (1991), the wife sacrificed her own career to maintain the family home and care for the children to enable the husband to complete his medical school education and later worked for the husband as he attempted to establish his own medical practice. Relying on the *O'Brien* decision, among others, the wife argued that Oregon courts should recognize enhanced earning capacity as a form of marital property and that her contributions to the husband's education and enhanced earning capacity entitled her to a share of that property. We declined to adopt the *O'Brien* approach and instead ordered an increase in the duration of spousal support to reflect the wife's contributions. *Stuart,* 107 Or App at 552-53.

While *Stuart* was pending before this court, the wife's lawyer in that case—who also happened to be a legislator—proposed legislation that expressly would have recognized enhanced earning capacity as a form of marital property. HB 3224, 66th Or Leg Assembly (1991). The version of the bill that passed the House provided that

---

[4] The Iowa Supreme Court also has recognized that "the potential for increase in the future earning capacity made possible by [a] law degree" and admission to a state bar, both of which were "conferred upon the husband with the aid of his wife's efforts," constitute an "asset for distribution by the court." *In re Marriage of Horstmann,* 263 NW2d 885, 891 (Iowa 1978). Interestingly, the court distinguished the license itself, which it concluded was not a marital asset, from the enhanced earning capacity that the license enabled, which it concluded was an asset. *Id.* In that case, the court awarded wife not a share of the husband's future earning capacity but reimbursement of her actual expenses; the court, however, hinted that "other methods" could have been used to compensate the wife for her contributions. *Id.*

"[t]he value of, and income resulting from, the enhanced earning capacity of either party acquired during the marriage shall be considered as property."

*Id.* (A-Engrossed). That bill contained no further qualifications as to the nature of the contributions that would entitle one spouse to a share of the other's enhanced earning capacity; in fact, the House deleted a provision that would have exempted enhanced earning capacity from the presumption of equal contribution and required an award to one spouse of a distributive share of enhanced earning capacity only upon proof of a "material contribution" to the education and training of the other. Minutes, House Committee on Judiciary, Subcommittee on Family Justice, May 6, 1991, p 8. That bill died in the Senate.[5]

During the following legislative session, what has now been codified as ORS 107.105(1)(f) was enacted. It is, so far as we can tell, the first of its kind in the nation; no other state has declared by statute that one spouse's enhanced

[5] The bill originally contained a requirement that a contributing spouse would be entitled to a share of enhanced earning capacity as property only upon proof of a "material contribution" to the enhancement. Representative Del Parks, the author of the bill, explained to the House Judiciary Family Subcommittee that the purpose of that language was to make sure that

"the spouse that seeks to have the award has to have made a 'material contribution.' That means a large contribution. * * * [A] small contribution is not enough. It has to be substantial and of prolonged duration. And the presumption that a housewife or a husband, just by the mere fact of marriage, equally contributed to the acquisition of the asset, is nullified by the provisions of this law."

Tape recording, House Committee on Judiciary, Subcommittee on Family Justice, April 22, 1991, Tape 101, Side A at 094. He further explained that the purpose of the bill and the foregoing requirement was to address the problem created by the spouse

"who has made a substantial sacrifice, be it time, money, forgone things, to enable the parties, so that we—quote—we could get ahead—end quote—that she has some reasonable reward for her efforts if the husband takes the asset from the marriage."

Tape recording, House Committee on Judiciary, Subcommitte on Family Justice, April 22, 1991, Tape 101, Side A at 229. The subcommittee amended the bill, however, deleting the requirement that the contributing spouse make "material contributions" to the enhancement. Minutes, House Committee on Judiciary, Subcommitte on Family Justice, May 6, 1991, p 8.

earning capacity is a species of property that under some circumstances may be subject to division along with other marital assets.[6] We turn, then, to the language of that unique enactment.

■ From the language of the statute in the context that we have described, it becomes clear that the legislature intended to accomplish two principal objectives. First, ORS 107.105(1)(f) was intended to establish that, contrary to the prior Oregon case law, enhanced earning capacity must be considered as marital property:

> "The present value of, and income resulting from, the future enhanced earning capacity of either party *shall be considered as property*."

ORS 107.105(1)(f) (emphasis supplied). Whatever the difficulties of "pigeon-holing" such an intangible asset within the existing framework of property law, the Oregon legislature has commanded that courts now *must* consider enhanced earning capacity as a species of property.

Second, ORS 107.105(1)(f) was intended to provide that one spouse may obtain a share of that property only by affirmatively establishing entitlement to it; no spouse is automatically entitled to a share of another's enhanced earning capacity. The statutory presumption of equal contribution that ordinarily applies to the acquisition of assets during a marriage expressly does not apply:

---

[6] *See* J. Thomas Oldham, *Divorce, Separation and the Distribution of Property* § 9.01, at 9-2.1 (1996) (characterizing Oregon's as "the most expansive statute" regarding enhanced earning capacity). Some other state statutes require contributions to enhanced earning capacity or to the acquisition of a professional license to be considered in the distribution of marital property or in the determination of spousal support. *See, e.g.*, Fla Stat Annot § 61.075(1)(e) (including as property distribution consideration "[t]he contribution of one spouse to the personal career or educational opportunity of the other spouse"); Wis Stat Annot § 767.255(3)(f) (same). Others allow a spouse contributing to another's education to be reimbursed for those contributions. *See, e.g.*, Cal Fam Code § 2641 (requiring reimbursement for "contributions to education or training of a party that substantially enhances the earning capacity" of the other spouse); La Civ Code Art 121 (allowing court to award a sum for "financial contributions" to other spouse's education). Oregon's is, however, the only statute to declare that the enhancement of earning capacity is itself property.

"The presumption of equal contribution to the acquisition of marital property, however, shall *not* apply to enhanced earning capacity."

ORS 107.105(1)(f) (emphasis supplied). Instead—and in contrast to enhanced earning capacity legislation that had passed out of the House in 1991—the statute requires a threshold showing that contributions of a certain type were made and that those contributions were of a sufficient quantity and duration as to justify an award of a share of the enhancement as property:

"A spouse asserting an interest in the income resulting from an enhancement of earning capacity of the other spouse must demonstrate that the spouse made a material contribution to the enhancement. Material contribution can be shown by, among other things, having contributed, financially or otherwise, to the education and training that resulted in the enhanced earning capacity. The contribution shall have been substantial and of prolonged duration."

ORS 107.105(1)(f).

To be sure, the statute regards the term "contribution" broadly to include those of both financial and nonfinancial nature; indeed, ORS 107.105(1)(f) expressly declares that the contribution of a homemaker spouse is a "contribution" to marital assets generally, and there is no mention of an intention to use the term more narrowly with respect to the particular asset of enhanced earning capacity. But the statute does not stop there. It goes on to say that not all contributions, however broadly defined, will trigger an enhanced earning capacity award. Only those that are "material," that are "to the education and training" that produce the enhancement, that are "substantial" and of "prolonged" duration suffice. Thus, some contributions indeed may have been targeted to the education and training of one spouse or the other, but, unless they are of a sufficient quantity and duration, they will not justify an award of enhanced earning capacity as property. Material contributions that are not sufficiently "substantial" or "prolonged" are not ignored; they may be considered under ORS 107.105(1)(d)(C) in the award of spousal support. They are not, however, sufficient to justify an award of a share of enhanced earning capacity *as property*.

The legislature did not define the precise contours of the terms "substantial" or "prolonged." It is apparent that it intended the courts to exercise some measure of judgment in the light of the particular facts of individual cases. Even the dictionary definitions of those terms defy precise delineation.[7] The general thrust of the legislature's intentions, however, are fairly clear: Not just any contributions will suffice. To justify an award of enhanced earning capacity, there must be evidence of material contributions that are sufficiently sizeable and over a sufficiently long period of years as to justify treating the intangible asset of enhanced earning capacity as a form of marital property and awarding the contributing spouse a share of it as property, instead of compensating the spouse for those contributions through spousal support. That is the only interpretation of the statute that comports with *all* of its language, both in text and context. Any other reading of the statute would render meaningless the qualifying language that the legislature deliberately included and effectively would restore the presumption of equal contribution, which the legislature deliberately chose to eliminate from evaluation of the appropriateness of an enhanced earning capacity award.

Assuming for the sake of argument that the language of the statute admits more than one reasonable construction in that regard, the legislative history confirms the foregoing interpretation. The language of ORS 107.105(1)(f) that is at issue in this case originally was enacted as House Bill 2946 in the 1993 Legislative Session. The bill was drafted by Representative Parks, who was the lawyer-legislator who represented the wife in the *Stuart* case and who unsuccessfully introduced the enhanced earning capacity bill during the 1991 session. In the first hearing on the bill before the

---

[7] The term "substantial," for example, ordinarily means

"existing as or in substance * * * having good substance: firmly or stoutly constructed * * * having a solid or firm foundation: soundly based: carrying weight ‹ a ; argument › ‹ ; evidence › * * * being that specified to a large degree or in the main * * *."

*Webster's Third New International Dictionary* 2280 (1976); *see also Black's Law Dictionary* 1280 (5th ed 1979) ("[o]f real worth and importance; of considerable value; valuable").

House Judiciary Civil Law and Judicial Administration Subcommittee, committee counsel explained that the bill was an outgrowth of the *Stuart* case and Parks's unsuccessful efforts in 1991. She explained that the purpose of his bill was to

> "designate enhanced earning capacity as property for the purposes of division of property during a dissolution action. This is based on a recent case, *Stuart and Stuart*, which is a 1991 Court of Appeals case. This measure would recognize that the spouse who contributed to the acquisition of a valuable asset, such as a better education, that creates enhanced, or, actual enhanced earnings, would be awarded a portion of the value of that asset as an economic partner."

Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side A at 017. Referring to the *Stuart* case, Parks explained:

> "These are two people that in their married life did one thing and that was, among other things, and that was to make a mutual decision on a business arrangement and that was, in this case, that the husband—all of the assets of the family were directed toward increasing his earning capacity. And it just flat is not fair that on dissolution he walks off with the big asset in the marriage * * *."

Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side A at 025. According to Parks, this court's award of indefinite spousal support to compensate the wife for her contributions was inadequate, because spousal support is based generally on the equalization of current earning capacity without regard to future enhancement and because spousal support is terminable upon a showing of a substantial change in circumstances. In describing the features of his bill, Parks emphasized the principal difference between the current proposal and the 1991 bill that was passed out of committee, namely, that the 1991 bill lacked any reference to the quality or quantity of the contributing spouse's contributions:

> "The bill that passed last time [in the House] did not require that the contributing spouse made a material and substantial contribution for a long duration to the enhanced earning capacity. That wasn't in the bill that

passed. That [is] in the bill * * * that I propose this time. I think it's a more balanced approach, and it does require the contributing spouse to demonstrate those things, but only in the area of enhanced earning capacity."

Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side A at 287.

Helenjane Williams, a representative of the Older Women's League, testified in opposition to the bill, principally on the basis of its requirement that an enhanced earning capacity award would be conditioned on proof of a "substantial" and "material" contribution for a "prolonged" period of time:

"I don't think you should—I don't—but I don't like that: 'prolonged,' 'substantial.'

"* * * * *

"So this is—but the thing of it is, you know, they [the courts] are going to take those words and interpret them in their own way. And once they start—because they'll look at it differently and say: Well here's your alimony over here. Now here's this enhanced earning thing and it says 'substantial,' * * * then this leaves the older woman in the garbage can frankly."[8]

Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side B at 021-130. Williams further complained that

---

[8] In written testimony submitted to the subcommittee, Williams further complained that the bill

"would put the entire burden of proof on the contributing spouse. The contributing spouse would also have to prove that they [sic] had made a 'material' and a 'substantial' contribution for a 'prolonged duration.'

"* * * * *

"It stacks the deck against the contributing spouse as it has deleted the protection of the present law with its presumption of equal contribution to the marital assets and property. It substitutes the following: 'THE PRESUMPTION OF EQUAL CONTRIBUTIONS TO THE ACQUISITION OF MARITAL PROPERTY, HOWEVER, DOES NOT APPLY TO ENHANCED EARNING CAPACITY.' "

Testimony, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, HB 2946, April 27, 1993, Ex C (capitalization and underscoring in original).

the bill did not make clear that nonfinancial contributions could be considered "contributions" within the meaning of the law. A member of the subcommittee asked if an amendment making clear that nonfinancial contributions could suffice would satisfy her concerns in that regard. Williams replied that it would, but that she still opposed the bill's references to "substantial" and "prolonged" contributions. Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 92, Side A at 355-400.

A third witness, Diane Thelen, testified in support of the bill. She described her personal experience of devoting her own time and resources to the development of her husband's career, only to be deprived of any share of his enhanced earnings upon their divorce:

> "I was the full-time breadwinner and tuition payer and so forth. And I had a very successful career in Eugene. I didn't want to leave Eugene. But at that point, when he graduated from architecture school, he felt he needed to return to Portland. It was better to be up here, up there, to get—for his career advancement. So his career was what we focused on at that point. And we came back to Portland and I got another job with the Portland Public Schools. * * * I put my things on hold—I had been encouraged to go into administration—everything was put on hold again while he started his business. And I supported us, again, while that got off the ground. It was a conscious decision. It was not something that I was not—didn't go along with. I also did most of the household tasks and caring for our children, because he was busy. I was also very actively involved in the business."

Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side A at 196. When the marriage dissolved "very suddenly," her contributions to her husband's career were not considered in the disposition of their marital assets; she received half of their assets, but her husband's enhanced earning capacity was not included as an asset:

> "Unfortunately I put all of my eggs into one basket. That basket was his earning potential as an architect/contractor. I feel that it is unfair that I received only 50% of the eggs,

and he walked away with the other 50% of the eggs and the basket to boot."

Testimony, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, HB 2946, April 27, 1993, Ex C.

At the work session on HB 2946, Representative Jim Edmunson proposed an amendment to address at least a portion of the concerns expressed by the representative of the Older Women's League. That amendment, which passed without objection, added the language "financially or otherwise" to the contributions that may trigger the enhanced earning capacity award. Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side B at 153. The bill then passed out of the subcommittee and was sent to the House Judiciary Committee, which unanimously approved the bill with minor amendments not pertinent to this appeal.

In the debates on the House floor, Parks explained HB 2946 in much the same terms as he had described it to the House Judiciary Subcommittee:

"What it says is that, when two people are married for a long period of time and they devote a substantial portion of their assets to the acquisition of an asset and, in this case, an asset that is an enhanced earning capacity of one of the partners to the marriage, then the other partner needs to be recognized as a partner, much the same as we do in the dissolution of a business, and some evaluation [must be] made of that earning capacity and, where relevant, the judge makes some monetary award. This probably will not apply in—I'm just guessing—but I don't think it would apply in more than 5 percent of the cases. But it's just there when fairness requires that that be given consideration."

Tape recording, House Floor Proceedings, May 17, 1993, Tape 90, Side A at 274. When asked what Parks meant by "a long period of time," he replied:

"That would be up to the courts in the individual circumstance. And that's the way all divorce cases are decided in Oregon. Generally, we say a long marriage—a marriage of long duration is more than ten years. That would probably be the threshold consideration here. But, in addition to

that, the spouse who seeks to have this considered by the court would have to show: one, there was a material contribution, which in ordinary language means 'this was a big-time contribution,' and secondly, it was over a prolonged period of time. What we're talking about is like a college education, or one spouse putting the other spouse through medical school. Those sorts of prolonged contributions to the enhanced earning capacity."

Tape recording, House Floor Proceedings, May 17, 1993, Tape 90, Side A at 301. Without further debate, the measure was approved by the House.

At a hearing before the Senate Judiciary Committee, Parks explained the bill in personal terms:

"And I find it easier to use myself to explain this bill. I've been married for 30 years. During the course of the 30 years, every decision that my wife and I made in reference to how we would handle the marriage, at least the economic side, was weighted to what was best for my education first, and then my career, and then the building of a practice. And every time those decisions were in conflict, and they often were, we made the decision together that, what was best for me, was best for us; because we were a partnership and, of course, we still are. Many people make those kinds of decisions and as for one reason or another, 20 years out, the marriage falls apart. So they are in the same position that I am, and I can think of nothing that would be more unfair than to get divorced now, for the court to divide what the assets are in our family and to say that, because I have a professional degree, that's a nondivisible asset, and my wife is not entitled to that."

Tape recording, Senate Judiciary Committee, June 9, 1993, Tape 187, Side A at 023. Parks emphasized that not all contributions will suffice to justify an enhanced earning capacity award:

"This bill says that the wife—and we're normally talking about the wife—the wife has to make a substantial contribution for a prolonged period of time to the acquisition of an enhanced earning capacity. Those are big terms, but they're no more big than what the law says is 'reasonable,' what is a 'material contribution,' what is a 'substantial part performance,' what is the value of a life, what is the value of a scar, what is the value of an arm—they're no different.

Because in Oregon, we try and match the remedy to the injury, and sometimes, we have to give the judges flexibility."

Tape recording, Senate Judiciary Committee, June 9, 1993, Tape 187, Side A at 023. Representative Kate Brown also testified in support of the bill. She pointed out the fact that the House had deleted reference to enhanced earning capacity in setting a spousal support award and proposed that that language be restored. She explained that spousal support should remain available to compensate for contributions that are not sufficiently direct to require an award of enhanced earning capacity as property. Parks agreed and explained:

"I agree with that, and I'll tell you the rationale for that is that in someplace in here, the attorney for the supporting spouse is gonna really have to make an election, and in the course of that, the court could find that they [*sic*] did contribute to the education and the training and the earning power, but it was not substantial and it was not over a prolonged duration, but it was such that would entitle it to be considered in the area of spousal support. So it should be in there, and I think the practicalities of it would be that a court would—in making its findings would say: 'I find that fits more appropriately here than it does in the property aspect.' And I think that's a good change and it's something that we overlooked in the House."

Tape recording, Senate Judiciary Committee, June 9, 1993, Tape 187, Side A at 105. After discussion on other matters not pertinent to the issue in this case, the committee approved the bill, with the proposed amendment as to the spousal support statute. HB 2946 ultimately was approved by the Senate with no significant debate.

Drawing conclusions as to legislative intent largely from colloquies in committee hearings always is risky business. *See, e.g., Davis v. O'Brien*, 320 Or 729, 745, 891 P2d 1307 (1995) ("isolated statements made in committee are not necessarily indicative of the intent of the entire legislature"). Nevertheless, it clearly is the practice of the Oregon Supreme Court to rely on such materials as evidence of legislative intent, and we are in no position to disregard that practice. *See, e.g., Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 521-23, 888 P2d 544 (1995) (statements of two witnesses

and two legislators). Moreover, reliance on the legislative history we just have recounted is supported by the fact that several themes are consistently reflected in both houses and throughout the legislative process, and therefore are more likely to reveal the intentions of the legislature as a whole.

The first of those consistent themes is that the legislature deliberately included the requirement that awarding a share of enhanced earning capacity as property be conditioned on proof of "material" contributions to the enhancement that are "substantial" and of "prolonged" duration. The legislature apparently was well aware that such a threshold showing would limit the number of awards. Even in the face of complaints by the Older Women's League that the effect of that requirement would significantly reduce the availability of that remedy, the legislature left the language in the law. Over and over, throughout the legislative process, the qualification that enhanced earning capacity awards will be limited to cases in which contributions are "material" and "substantial" was touted as a key feature of the bill and a significant improvement over the version of the bill that failed to pass in 1991.

The second of those consistent themes was that the references to "material," "substantial" and "prolonged" were understood to impose a significant evidentiary burden on the spouse seeking a share of the enhanced earning capacity. Once again, throughout the process, it was emphasized that an award of a share of enhanced earning capacity as property must be conditioned on proof of "a big-time contribution," "putting all of [the contributing spouse's] eggs in one basket," direction of "all of the assets of the family" toward enhancing earning capacity. That is consistent with the stories of substantial sacrifice that prompted the legislation in the first place. Parks, for example, emphasized in his description of the *Stuart* case the "mutual decision" of the husband and the wife to devote all of their assets to the development of his business, a decision that required the wife to give up her own career and to work for the husband's business. Thelen similarly stressed that she "was the full-time breadwinner and tuition payer," that she "put [her] things on hold," and that "everything was put on hold" to enable her husband to start his business. Parks echoed that emphasis, explaining that

his bill was intended to apply to a narrow set of facts "when two people are married for a long period of time and they devote a substantial portion of their assets" to the development of enhanced earning capacity. Consistently and repeatedly, the legislative history reveals that, although the law was intended to recognize generally a broad range of activities as "contributions" to the acquisition of marital assets, as to enhanced earning capacity, those contributions must be "big-time" to justify an award of that particular species of property.

The third consistent theme revealed in the legislative history is that, in recognition of the significant evidentiary burden placed on spouses asserting a right to a share of enhanced earning capacity as property, the legislature chose to retain consideration of enhanced earning capacity as a factor in the setting of spousal support in those cases in which the contributing spouse is unable to establish the requisite "material," "substantial" and "prolonged" contributions. Indeed, early in the process, the House deleted reference to this consideration in the spousal support provision of the statutes, and the Senate restored it, expressly for the purpose of providing a means of acknowledging and compensating for contributions to enhanced earning capacity that were not sufficient to justify an award of the enhancement as property.

With the foregoing analysis of the statute in mind—including its language, its context and its history—we turn to the facts of this case to determine whether wife established that she made "material" contributions to her husband's enhanced earning capacity, which were "substantial" and of a "prolonged" duration. At the outset, we note that wife concedes that she did not contribute directly to his educational expenses; those were more than adequately covered by the loans, grants and scholarships that husband obtained. We also note that wife further concedes that she was not required to alter her own occupational or educational goals in any way to accommodate husband's education and training. She did move to Iowa with husband for his three-year residency, but she offered no testimony that the move interrupted her own plans at all. We further note that, during the approximately 15-year period from the time husband started medical school until the separation, wife worked four years; during the

remaining years—in particular, the years of husband's dermatology residency—wife did not work and instead went to school, first to community college on a part-time basis and then to Oregon State University. We finally note that there is no evidence that husband's medical school education in any way was conditioned on wife bringing in income during those four years that she did work. Said another way, there is no evidence that wife needed to work to enable husband to go to medical school. Similarly, there is no evidence that, during husband's residency, wife was required to take any particular action to facilitate her husband's career; to the contrary, during that time, she herself went to school. In the light of that evidence, we are not persuaded that wife made "material" contributions to the enhancement of husband's earning capacity that were "substantial" and "prolonged."

Wife insists that her work during husband's attendance at school, her performance of various household tasks and husband's use of her automobile together constitute the requisite showing to justify an award of a share of husband's enhanced earning capacity as property. We have no doubt that each of those efforts constitutes, either directly or indirectly, a "contribution" to husband's medical school education. We do not, however, find any basis under the circumstances of this case to consider them sufficiently "substantial" and "prolonged" to satisfy the showing that the legislature required as a condition to an enhanced earning capacity award. Her employment, for example, certainly allowed the parties to defray living expenses while husband attended school, at least to some extent. The problem is that, on the record before us, we do not know to what extent that was so. Moreover, as we have noted, there is no evidence that the parties needed wife to work in order for husband to continue going to medical school. The mere fact that one spouse happened to be employed while the other went to school cannot, by itself, satisfy the legislative requirements for establishing entitlement to an enhanced earning capacity award. If that were not so, we would be required to award enhanced earning capacity in virtually all cases in which one spouse or the other attended school, and clearly that result does not comport with the legislature's expressed intention to limit

the availability of the extraordinary remedy afforded by ORS 107.105(1)(f) to a relatively few cases.

Similarly, the fact that wife performed various household tasks while husband went to medical school by itself is insufficient. There is no evidence that those tasks were required to enable husband to complete his education. There is no evidence even of how those efforts facilitated his education. There is no question that the performance of household tasks generally contributes, directly or indirectly, to the acquisition of marital assets. That much is established by statute. ORS 107.105(1)(f). But the fact remains that the legislature saw fit to declare that the presumption as to the effect of those contributions—which ordinarily applies to the acquisition of marital assets—does not apply to the acquisition of enhanced earning capacity. Thus, although household work might in an appropriate case suffice to justify an award of enhanced earning capacity under ORS 107.105(1)(f), there simply is no evidentiary basis for such a conclusion in this case.

Finally, as to the use of the automobile, we again accept for the sake of argument that it constitutes some contribution to husband's education in the form of eliminating the need to spend money on alternate transportation. But in terms of the larger picture of the acquisition of husband's medical education over a period of years, we conclude that such a contribution hardly qualifies as the sort of "substantial" one that requires an award of a share of enhanced earning capacity as property.

We conclude, therefore, that the trial court erred in awarding wife any share of husband's enhanced earning capacity as property under ORS 107.105(1)(f). Wife failed to establish the required "material" contributions to husband's education or training that were sufficiently "substantial" and "prolonged" to justify such an award under that statute.

The dissent arrives at a different conclusion, based largely on a different reading of what the statute requires to establish that a contributing spouse is entitled to a share of enhanced earning capacity as property. We have considered

carefully the arguments put forth by the dissent, but we find them unpersuasive.

The dissent first declares that "[n]either the text nor the context of the statute assists us" in construing its terms. 145 Or App at 414. The dissent offers no explanation for that conclusion and makes no attempt to explain why our analysis of the language of the statute in its context is incorrect.

The dissent next purports to "agree with the majority that it is appropriate" to examine the legislative history to determine the intended meaning of the statute. *Id.* That mischaracterizes our opinion. We do not, in fact, find it necessary to examine the statute's history to ascertain its intended meaning. We do, nevertheless, examine it in some detail, "[a]ssuming for the sake of argument" that it is necessary to do so, in order to establish the error of the dissent's analysis. 145 Or App at 393.

The dissent next takes us to task for our interpretation of the legislative history, dismissing it as "a prolonged massaging of one statement" by Representative Parks that a material contribution means a "big-time" contribution. 145 Or App at 414. That, too, mischaracterizes our analysis, which examines the legislative history as a whole, in chronological sequence, from committee to floor, from one house to the other. In contrast, the dissent elects to ignore such statements as Parks's and approaches the legislative history of the statute in a manner that recalls Judge Harold Leventhal's analogy of "entering a crowded cocktail party and looking over the heads of the guests for one's friends."

Even in its selective analysis of the legislative history, the dissent errs. In particular, the dissent relies heavily on testimony of witnesses who urged that the unpaid labor of homemakers not go ignored in determining entitlement to enhanced earning capacity. In so doing, the dissent ignores the fact that those remarks were made in the context of discussions about the definition of the "contributions" that may be taken into account by the courts. As we have taken pains to repeat in our analysis of the language of the statute and the same legislative history that the dissent now cites, it is quite clear that the contributions of homemakers are "contributions" within the meaning of the statute. That does not

mean that they are automatically and in all cases sufficiently "material" or "substantial" or of sufficiently "prolonged duration" to warrant awarding the contributing spouse a share of enhanced earning capacity as property under ORS 107.105(1)(f).

The dissent also concludes that, on *de novo* review of the facts, wife is entitled to a share of husband's enhanced earning capacity as property. The dissent concludes that, because wife worked for nine years, while husband completed graduate school and began his medical school education, and worked in the home thereafter, she must be regarded as having made "substantial" and "material" contributions to his enhanced earning capacity over a "prolonged" period of time. The dissent's analysis of the facts, of course, relies on a flawed understanding of the evidentiary requirements contained in ORS 107.105(1)(f); thus, its "*de novo*" review of the facts rests on a false foundation at the outset. Apart from that, we are unpersuaded by the dissent's analysis of the facts for several reasons in addition to those already stated.

■ First, the dissent attempts to "bootstrap" wife's work while husband completed his master's degree in wildlife ecology to give the appearance of a longer duration of support for his enhanced earning capacity. In point of fact, wife's own expert testified that husband's master's degree was of no consequence in his calculations of husband's earning capacity.

■ Second, the dissent makes much of wife's recollection that husband expressed gratitude for wife's support during the three years of medical school. Gratitude, however, does not determine whether support was "material," "substantial" and "prolonged" within the meaning of the statute. Nor does it necessitate awarding a share of enhanced earning capacity as property, as opposed to reflecting contributions in the form of increased spousal support, as allowed in ORS 107.105-(1)(d)(C).

Third, the dissent spares no effort in attempting to paint husband as a "bad" person, recalling, in particular, an incident in which husband supposedly ejected wife from the family residence to make room for a girlfriend. To begin with, the statute does not include as a consideration whether one

party can produce "dirty laundry" about the other; the dissent's references to such matters must be understood as no more than an attempt to create sympathy for wife. Furthermore, the dissent distorts the facts themselves. By 1992, when husband supposedly informed wife of a paramour and asked wife to leave the family residence, the parties had been separated and living in different cities for over two years. Wife had been living in the family residence, but she did not like living there and told husband that, whether he returned or not, she wanted to leave. Husband returned, and the parties continued marriage counseling. During the counseling, the parties discussed, among other things, wife's need to look for another home. Husband ultimately purchased outright a new home for wife. It was in that context that husband informed wife that it was time for her to move into the new house and out of the family home. It also bears noting that, when wife began to testify about the incident, the trial court questioned its materiality and admonished the parties not to needlessly "bloody each other" with such testimony. We, too, question the materiality of the incident and the dissent's reliance on it in urging a different disposition of this case. In short, the dissent's analysis of the facts of this case does not persuade us that we have erred in concluding that wife has not shown her entitlement to a share of husband's enhanced earning capacity as property under ORS 107.105(1)(f).

The dissent ventures various opinions on other issues concerning the proper valuation of husband's enhanced earning capacity and the proper allocation of a share to wife. Because of our disposition of the first assignment, we need not, and do not, express any opinion on those matters.

■ Husband next assigns error to the trial court's award of indefinite spousal support in the amount of $2,000 per month. He contends that, in the light of wife's age, good health, education and employment capabilities, and her sizeable property award, she is entitled to no more than $1,000 per month for four years. Wife contends that, if anything, the trial court did not award enough spousal support. Particularly in the event of elimination of the enhanced earning capacity award, wife argues, she should be awarded substantially more than $2,000 per month to compensate her for her

contributions to husband's medical education. Wife argues that the income disparity of the parties, her need for additional education and training, and the extremely comfortable lifestyle to which she had become accustomed all warrant a significant, indefinite spousal support award.

When we set the amount and duration of spousal support, we attempt to arrive at an "amount of money for such period of time as it may be just and equitable" for the paying spouse to pay. ORS 107.105(1)(d). As we explained in *Christensen and Christensen*, 123 Or App 412, 416, 859 P2d 1192 (1993):

> "We do not attempt merely to eliminate any disparities in the parties' incomes or to enable one spouse to look to the other indefinitely for support. *Wolhaupter-Heinzel and Heinzel*, 108 Or App 514, 521, 816 P2d 672, *rev den* 312 Or 526 (1991). We set the award at an amount that is reasonable and that will enable the party receiving the support to enjoy a standard of living that 'will not be overly disproportionate' to what was enjoyed during the marriage, to the extent that is practicable. ORS 107.105(1)(d)(F); *Grove and Grove*, 280 Or 341, 350, 571 P2d 477, *mod* 280 Or 769, 572 P2d 1320 (1977). We set the duration of that award 'on terms that are equitable between the parties,' taking into account both need and ability to pay and keeping in mind 'the goal of ending the support-dependency relationship within a reasonable time if that can be accomplished without injustice or undue hardship.' *Grove and Grove, supra*, 280 Or at 353."

We applied those principles to facts not dissimilar to those presented in this case in *Ley and Ley*, 133 Or App 138, 890 P2d 440 (1995). In that case, the parties had been married for 14 years. At the time of trial, the husband was 41, and the wife was 37. The parties had two minor children. The husband earned approximately $250,000 per year. The wife worked sporadically outside the home; her primary role in the marriage was that of homemaker. Although the parties enjoyed a substantial income during the marriage, they had accumulated relatively little in the way of assets. Upon dissolution, the wife was awarded the custody of the children, approximately $62,000 in assets—which represented the lion's share—and indefinite spousal support that was

stepped down from $9,075 per month to $1,500 per month over the course of 12 years.

We reduced the amount of the spousal support and limited its duration. We found that, in the light of the wife's relatively young age, good health and employability, it was appropriate to provide her with support for a limited time to enable her to develop her skills through education or work experience. We concluded that it was not appropriate, however, to award support indefinitely, particularly in the light of "the statutory objective of ending the support dependency relationship within a reasonable time." *Id.* at 143.

In this case, wife is relatively young and in good health. She has no dependents. She was not required to be absent from the job market to perform the role of homemaker and did not forgo any employment or academic opportunities during the marriage. She was awarded over $250,000 in property, including a paid-for residence, a car and a substantial amount of cash. She does have limited earning capacity and no doubt requires additional education and training to become self-supporting at a level not unreasonably disproportionate to what she enjoyed during the marriage; she testified that she would like to obtain a master's degree in social work and pursue further employment in that field, which would take at least two or three more years of education and training. Furthermore, as we have previously noted, it is appropriate for us to recognize that she did contribute in some fashion to her husband's medical education.

We conclude that an award of $2,000 per month is not sufficient to enable wife to make the transition to self-sufficiency without undue hardship. Particularly in the light of her educational needs, and in the light of her own contributions to husband's medical school education, we conclude that an award of $4,000 per month for four years is appropriate, followed by $2,500 per month for three years and $1,500 per month for three years. As in *Ley*, we do not find that an award of indefinite support comports with the statutory objective of ending the support-dependency relationship within a reasonable time. *Id.* at 143. We are well aware of the fact that our decision will result in some disparity in the parties' standards of living. As we noted in *Ley*, however, "there

are few dissolution cases in which the parties' standards of living do not go down." *Id.* at 142; *see also Christensen,* 123 Or App at 417 ("No doubt reducing the duration of spousal support will perpetuate some disparity between husband's and wife's incomes. However, that alone is not reason to continue spousal support indefinitely."). Moreover, we find that an award in excess of $330,000 over the next ten years to an individual with a home, substantial assets and no dependents does not work an "injustice or undue hardship." *Grove,* 280 Or at 353.

Husband finally assigns error to the trial court's valuation of his business. In particular, he complains that the trial court erred in assigning a value for the goodwill of husband's medical practice at $50,000. He argues that it is inappropriate to award a share of enhanced earning capacity as property and a share of goodwill, as both reflect the same economic value of husband's ability to generate income. We need not address that argument, and express no opinion on it. Having concluded that a share of husband's enhanced earning capacity should not be awarded to wife as property, we have avoided the sort of "double counting" of husband's earning capacity that is the basis of his assignment.

Reversed and remanded for entry of a modified judgment awarding wife no share of husband's enhanced earning capacity as property and awarding wife spousal support of $4,000 per month for four years, followed by $2,500 per month for three years, followed by $1,500 per month for three years commencing upon entry of the original judgment; otherwise affirmed. Costs to husband.

**RIGGS, J.,** dissenting.

For the reasons that follow, I have concluded that the trial court did not err in compensating wife for her contribution to husband's enhanced earning capacity (e.e.c.). I would hold that the resulting property award under ORS 107.105(1)(f) was warranted in this case.

First, the majority omits certain important facts. Shortly after the parties began living together in 1973, both worked and husband also attended graduate school. In 1976,

the parties married. Husband worked sporadically and continued his graduate-level studies until 1978, when he entered medical school. Between 1978 and 1982, husband was a full-time student and wife continued working full time.

By the end of 1982, the parties had been together for nine years. During that time, wife had worked continuously outside the home and husband had obtained a medical degree. According to wife's unrefuted testimony, during those nine years she also tended to the bills and did all of the cooking, cleaning, laundry, shopping and home maintenance. Her contributions allowed husband to devote virtually all of his time and energy to taking graduate courses, applying for medical school, studying and obtaining his medical degree. During husband's medical school years, wife typically left the house at 7:30 a.m., walked to work, worked until 5:30 or 6:30 p.m., and often did the grocery shopping on the walk home. When she arrived home, husband "was either asleep or studying."

The end of husband's educational endeavors marked a turning point in the parties' relationship. Wife testified that husband

> "said I didn't need to work. I'd helped him and he would say he was incredibly grateful for me helping him get to where he was and he said it was my time. He said he would make more money than we possibly would ever need and I did not need to work unless it was my passion."

During the next eight years, from 1982 to 1990, wife attended school, continued to take care of all the domestic chores, and underwent numerous attempts at *in vitro* fertilization in an unsuccessful effort to conceive and bear a child. The majority makes much of the fact that wife did not forgo any academic or career goals, but the undisputed testimony at trial was that wife *had* no such goals, because she planned on having a family. Husband told her that she could do whatever she wanted and could "trust that everything would be taken care of."

Then, in 1990, husband informed wife that his girlfriend would be moving into the family residence. According to wife, husband said, "if you can't live with [the girlfriend's

presence in their home], you will have to leave." Wife left.[1] She went on with her life, completed her bachelor's degree, then applied to graduate school but was not accepted.

We now are called upon to make a just and equitable distribution of the parties' property, including the value of wife's contribution to husband obtaining a medical degree with a specialty in dermatology. To me, the case is clear, as it was to the trial court. Having had the benefit of listening to all of the testimony, the trial judge stated twice during the proceeding below: "There is no question but that this woman made a substantial contribution to this man's medical degree."[2] That degree is the very basis for husband's significant earning capacity. Accordingly, I would affirm the trial court's decision to make a property award to wife for her contribution to husband's enhanced earning capacity. Because of that conclusion, I would also address the numerous arguments that husband makes on appeal.

First, husband contends that application of the relevant portion of the statute[3] is not mandatory, because the legislature used the word "as" in the following sentence: "The

---

[1] The majority believes that it is improper to make any mention of the facts underlying the reason for the parties' separation. However, those facts are relevant in the light of legislative history showing that one of the many concerns of the legislators who enacted the e.e.c. portion of ORS 107.105(1)(f) was the phenomenon of new professionals—who the legislators acknowledged could be male *or* female but at this point in history are predominately male—dumping their first wives just after those wives have completed the process of putting their husbands through professional educations. *See, e.g.*, Tape Recording, House Judiciary Committee, Civil Law Subcommittee, April 27, 1993, Tape 92, Side A (Testimony of Rep. Edmunson). For a humorous example of the circumstances that might have motivated the legislature, *see* Olivia Goldsmith, *First Wives Club*, (Poseidon Press 1992).

[2] Even counsel for husband said, in his closing argument, "We don't dispute that she made a contribution to his earning power" by working full time and handling every domestic detail during husband's four years of medical school.

[3] ORS 107.105(1)(f) provides, in part:

"The present value of, and income resulting from, the future enhanced earning capacity of either party shall be considered as property. The presumption of equal contribution to the acquisition of marital property, however, shall not apply to enhanced earning capacity. The spouse asserting an interest in the income resulting from an enhancement of earning capacity of the other spouse must demonstrate that the spouse made a material contribution to the enhancement. Material contribution can be shown by, among other things, having contributed, financially or otherwise, to the education and training that resulted in the enhanced earning capacity. The contribution shall have been substantial and of a prolonged duration."

present value, and income resulting from, the future enhanced earning capacity of either party shall be considered *as* property." ORS 107.105(1)(f) (emphasis supplied.) He argues that, because the legislature did not simply say that e.e.c. "shall be considered property," courts have *discretion* to treat it as such. However, the statutory text makes plain that husband's emphasis on and novel interpretation of the word "as" is a vain attempt to avoid the statute's dispositive term, which is "shall." The context confirms this. Elsewhere in ORS 107.105(1)(f), the statute provides that a "retirement plan or pension or an interest therein shall be considered as property." In both instances, the legislature's use of the word "as" alerts courts that an item that has not always been considered property now will be considered "as" such, and its use of the word "shall" means that courts do *not* have discretion in this matter: We must treat e.e.c. as property.

Because husband does not suggest that a court may consider enhanced earning capacity as anything *other* than property, *i.e.*, that a court may treat it as income that is relevant to a support award instead of a property award, I understand the gravamen of his argument to be that courts are not *required* to value and distribute enhanced earning capacity in every case where a spouse has earned a professional degree or license during the marriage. With that narrow proposition I would agree. By its own terms, the statute limits its applicability to those cases in which a spouse both claims an interest in the enhanced earning capacity and carries the requisite burden of proof: "A spouse asserting an interest in the income resulting from an enhancement of earning capacity of the other spouse must demonstrate that the spouse made a material contribution to the enhancement." ORS 107.105(1)(f). If a spouse asserts no such interest, or fails to demonstrate a material contribution, then there is no basis for awarding it.

My dissenting opinion should not be read to suggest that I believe this new statute is sound family law policy, or that a more effective legislative policy choice (*e.g.*, simply changing the spousal support statutes) could not have been made to accomplish the broad social objectives that its sponsors attempted to address by this legislation.

At this juncture, it bears noting that in a letter to the parties, the trial court explained that the $15,000 annual award to wife was made

"on account of husband's enhanced earnings, *less wife's enhanced earning capacity,* and after considering spousal support award, property division, including goodwill, etc." (Emphasis supplied.)

On the facts of this case, however, offsetting the parties' relative contributions to one another's enhanced earning capacity was not an appropriate method to employ, because husband failed to *claim* any interest in the enhanced earning capacity that wife will enjoy as a result of her sociology degree. At oral argument, counsel for husband suggested that husband's claim to wife's enhanced earning capacity was made below by virtue of the fact that his expert testified about it. However, the testimony of an expert is no substitute for an articulated claim by husband to a portion of wife's enhanced earning capacity nor does it fulfill the statutory requirements that husband both "assert[ ] an interest in" wife's enhanced earning capacity and demonstrate that his contribution thereto was material. ORS 107.105(1)(f). Accordingly, the trial court had no basis for awarding husband a portion of wife's enhanced earning capacity either directly or indirectly by means of the offsetting calculation that it employed here. I would therefore remand for recalculation of the award amount.

Husband next argues that, because enhanced earning capacity awards are not subject to the presumption of equal contribution that applies to marital assets, *Pugh and Pugh,* 138 Or App 63, 69, 906 P2d 829 (1995), *rev den* 322 Or 644 (1996), enhanced earning capacity should be categorized as property that is subject to the dispositional authority of the court but is *not* a marital asset. That is incorrect as a matter of law. Because husband's enhanced earning capacity was "acquired during the marriage, it is a marital asset." *Pierson and Pierson,* 294 Or 117, 122-23, 653 P2d 1258 (1982); *see also Stice and Stice,* 308 Or 316, 325, 779 P2d 1020 (1989). Although enhanced earning capacity does differ significantly from other marital property, in that it does not carry with it the presumption of equal contribution, it is subject to division

by the court if the party seeking the award can prove the statutory elements and if such an award would be "just and proper in all the circumstances." ORS 107.105(1)(f).

Husband next contends that wife did not prove the existence of the statutory elements, that is, she did not meet her burden of establishing that her contribution to husband's enhanced earning capacity was "material," "substantial" and "prolonged." Neither the text nor the context of the statute assists us in defining those terms. Therefore, I agree with the majority that it is appropriate in this case to turn to the substantial legislative history that underlies the enactment of this provision of the statute. In the tape recorded proceedings of the relevant house and senate committees, legislators and lobbyists discussed at length what would be required to establish that a spouse had made the requisite contribution to the enhanced earning capacity of another spouse. Although the tapes do not contain an explicit definition of the relevant statutory terms, the examples provided by Representative Del Parks, who sponsored House Bill 2946,[4] Representative Kate Brown, who testified on behalf of the bill, and Representative Jim Edmunson, who was a member of the house subcommittee that considered the bill, shed light on the types of contributions that the legislators viewed as sufficient to give rise to an enhanced earning capacity award.

The majority and I differ in our interpretation of the legislative history. To my mind, the majority's interpretation rests on a prolonged massaging of one statement made by Representative Parks on the floor of the House: Material contribution "means 'this was a big-time contribution.' " 145 Or App at 398. But there was a *considerable* amount of legislative history behind the enactment of the enhanced earning capacity portion of ORS 107.105(1)(f), and I have found none that is contrary to my view that enhanced earning capacity was appropriately awarded to wife in this case.

For example, Representative Kate Brown, who testified in favor of the bill, stated that an enhanced earning capacity award "is simply another tool for the court to make

<hr>

[4] HB 2946 was ultimately enacted as Oregon Laws 1993, chapter 719, section 3, and codified at ORS 107.105(1)(f).

an equitable distribution." She opined that the bill would apply when, for example, the wife worked and the husband went to veterinary school; if, at the time of divorce, the wife's work had given her a "relatively equal capacity for self-support," which would affect her ability to obtain spousal support, HB 2946 still would allow her to be compensated, in the form of a property award, for her contribution to the husband's enhanced earning capacity. Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side A at 175. Representative Tom Brian, as Chair of the house subcommittee that considered HB 2946, stated that the bill was a response to the enhanced spouse who, at the time of divorce, *is too early in his career* to have reaped the large financial rewards of his new professional degree or license: "I think the whole purpose of the bill is to capture some fair portion of the future income[.]" Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side B at 324 (emphasis supplied). In the present case, husband had been a practicing dermatologist for only three years before he initiated the parties' separation.

A spokesperson for the Older Women's League testified about that organization's concern that the bill would not assist women who take care of children and the home but who "don't contribute dollars" to the household or to their spouse's education and training. Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 92, Side A at 274 (Testimony of Helen Jane Williams on behalf of Older Women's League). In response to those concerns, Representative Brown stated, "It's my understanding that the intent of the bill is that a substantial and material contribution would include non-income work." *Id.* at 355. Representative Parks agreed, saying, "This bill * * * doesn't have anything to do with monetary contributions, it says a substantial contribution can be anything[.]" *Id.* at 376. Finally, Representative Edmunson said:

"By talking about 'material contribution,' your concern is that the courts will view that as cash money, and *all the unpaid labor that women and men go through on behalf of*

*their husband or wife will somehow be disregarded.* And I think that's a fair criticism because the courts sometimes don't listen to these tapes. They read the law and say, 'It's clear enough to me and I'm not going to look at what Representative Brown or Edmunson said during the hearing.' Would your concern be taken care of if we just kind of added words in there that said that it could be money—because that would certainly be a material contribution—or labor or help or things of that nature that are not actual cash contributions, but just that we make that real clear in here that that's what we all agree to?" *Id.* at 404. (Emphasis supplied.)

The witnesses answered affirmatively.

In the work session that followed, Representative Edmunson moved to amend HB 2946 to state that the requisite contribution could be financial *"or otherwise."* The motion passed unanimously. Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side B at 145.[5] At no point in the House proceedings did any legislator state or imply that the unenhanced spouse *also* would have to prove that he or she had forgone career or other opportunities by staying home.

When Representative Parks presented the bill to the Senate Committee on Judiciary, he described it as follows:

"This bill addresses a situation that is not common in most marriages, but it does occur often enough that injustice results to people getting a divorce: * * * [D]uring the course of a relatively long marriage relationship, one of the parties acquires a substantially increased earning capacity, usually through the acquisition of a professional degree, and that person, upon divorce, * * * leaves with what is by far the greatest asset in the marriage, without any recognition to the other spouse." Tape recording, Senate Committee on Judiciary, June 9, 1993, Tape 187, Side A at 015-27.

That is precisely what occurred in this case.

---

[5] As is often the case in legislative proceedings, in order to capture as much of the testimony as possible, two tape recorders were used to record the subcommittee meeting held on April 27, 1993. The recording began on Tape 91, Side A, which was followed by Tape 92, Side A, then Tape 91, Side B, and finally Tape 92, Side B.

Representative Parks continued:

"This bill says that the wife—we're normally talking about the wife—the wife has to make a substantial contribution for a prolonged period of time to the acquisition of an enhanced earning capacity. *Those are vague terms.* But they're no more vague than what the law says is 'reasonable,' what is a 'material' contribution, what is a 'substantial' part performance, what is the value of a life, what is the value of a scar, what is the value of an arm; they're no different. Because in Oregon we try to match the remedy to the injury and sometimes we have to give judges flexibility. What I think this bill will really accomplish is that people parting from this kind of a marriage will be treated with dignity, *they'll be allowed to recover what their rightful contribution has been to the marriage*, and in many cases it'll be transformed from alimony into a property right." *Id.* at 075-093 (emphasis supplied).

Again, the focus was on the contribution to the marriage, not on proof that the unenhanced spouse gave up his or her own career or academic goals.

In the present case, it is undisputed that husband's future earning capacity was enhanced by the professional education that he acquired during the marriage. He is now in a position to earn substantially more than he would have otherwise. As noted above, I would hold that wife contributed to husband's enhanced earning capacity financially—through out-of-home work for the nine years between 1973 and 1982—and "otherwise"—through in-the-home work for the 17 years between 1973 and 1990. I would hold that both of those contributions were substantial and of prolonged duration. And finally, based on my *de novo* review of the record, I would find that such an award is especially appropriate here, where wife and husband both believed that wife had helped husband "get to where he was" as a result of those contributions.

Although not addressed by the majority, my conclusion that wife was entitled to an enhanced earning capacity award requires that I address husband's contention that his expert's method of valuing enhanced earning capacity was correct and that wife's expert's method was not. Wife submits

that husband's arguments regarding valuation are "academic" because the actual award that she received—$15,000 per year for as many years as husband works—represents less than half of the most conservative estimate of the present value of husband's enhanced earning capacity if he works for 20 years.[6] Wife's position indicates some confusion over the separate concepts of valuation and distribution. The trial court must distribute the parties' property, including the value of the enhanced earning capacity, in a manner that is "just and proper under all the circumstances," ORS 107.105(1)(f). Furthermore, because there is no presumption of an equal, *i.e.*, 50-50, contribution by the nonenhanced spouse, an award that is less or more than 50 percent is unsurprising. Here, the court determined that it was equitable to award wife a significant portion of husband's e.e.c, but a portion that was, nevertheless, less than half the full value thereof. That distribution decision is altogether separate from and has no bearing on the preliminary inquiry of whether the trial court engaged in a proper valuation of the asset in question.

The parties, as well as a respected commentator on enhanced earning capacity,[7] agree that, in broad terms, the value of a spouse's enhancement is calculated by subtracting net pre-enhancement earning capacity from net post-enhancement earning capacity, both of which are computed on the basis of the individual's work-life expectancy, discounted to present value.[8] In this case, the primary disagreement between the parties' experts was whether the post-enhancement figure should be based on *actual* or *statistically*

---

[6] A $15,000 annual payment for 20 years will total $300,000. Husband's expert testified that husband's enhanced earning capacity from his medical degree, minus wife's enhanced earning capacity from her bachelor's degree, would equal a net enhancement of $635,534 to husband.

[7] Paul T. Clausen, *"Enhanced Earnings Capacity"—The New Marital Asset*, ch 9, Oregon State Bar Family & Juvenile Law Section, Spring Conference materials (May 1996). Clausen's article was also published by the Family and Juvenile Law Section of the Oregon State Bar in *Family and Juvenile Law Newsletter*, volume 14, number 3 (June 1994), and in volume 54 of the Oregon State Bar Bulletin (June 1994), under the title *"A New Marital Asset?"*

[8] *See also* 2 *Valuation and Distribution of Marital Property*, § 23.06(3), at 23-115 (1996) ("The value of a professional degree is the discounted present value of the difference between what its holder will earn with the professional education and what he [or she] would have earned without such education."). Although I

*average* earnings. They also differed on the question of whether to factor in wife's enhanced earning capacity. After providing some necessary background information, I will address both issues.

In a case such as this, where husband came into the relationship with a bachelor's degree and left with a medical degree, logic dictates—and the parties agree—that the first task is to determine the statistically average annual net income figure for a male of husband's age who holds a bachelor's degree and a male of husband's age who holds a medical degree with a specialty in dermatology. The next task is to determine husband's work-life expectancy and then, using that expectancy figure and the two average annual net income figures (bachelor's versus medical degree), to calculate the total (lifetime) income figure for each degree. Those income figures then are discounted back to their lump sum present values. The difference between the two lump sum values represents the "enhancement" in earning capacity for a person with a medical degree over a person with a bachelor's degree.

Husband's expert testified that, in order to provide a consistent comparison of pre- and post-enhancement earning capacities, one must compare the annual income of the "statistically average" holder of the pre-enhancement degree (in this case, a bachelor's degree) against the "statistically average" holder of the post-enhancement degree (here, a medical degree with a specialty in dermatology). Wife's expert likewise testified that, because we do not know what husband's *actual* income would be, today, if he still held only a bachelor's degree, the pre-enhancement figure must be based on the income data for *average* males of husband's age holding a bachelor's degree. There being no real alternative, I would agree that reliance upon statistical averages to calculate a party's pre-enhancement income is the best method available for obtaining a "base line" by which to gauge the subsequent enhancement.

---

accept this "present value of future increased earnings" approach as the one that follows most closely the language of ORS 107.105(1)(f), I note that other valuation methods, especially reimbursement, opportunity cost and the labor theory of value, have been utilized elsewhere. For a discussion of those methods, *see* Krauskopf, "Property Distribution Principles," 3 *Family Law and Practice*, § 37.06(4) (1985).

Wife's expert calculated husband's enhanced earning capacity by calculating husband's actual, current earnings, multiplied by his work-life expectancy, and comparing that figure to what husband's hypothetical earnings would have been with only a bachelor's degree, multiplied by his work-life expectancy. After making adjustments for presumed future tax consequences and a presumed award of spousal support at $3,000 per month for 10 years, wife's expert arrived at a present value of $1,193,220 for husband's enhanced earning capacity.

Husband's expert calculated enhanced earning capacity by comparing the work-life expectancy values of husband's pre-enhancement degrees against the post-enhancement medical degree, and by making similar calculations for wife's enhanced earnings from her bachelor's degree. Husband's expert derived an enhanced earning capacity range for both husband and wife, and netted those calculations against each other. As noted above, that approach was inappropriate because husband made no claim to wife's enhanced earning capacity

As for the question of whether trial courts should use actual income or statistical averages to determine the post-enhancement income figure, the text of ORS 107.105(1)(f) does not articulate a particular method. However, the *context* suggests that the legislature anticipated the use of actual, not average, income figures: ORS 107.135(1)(e)(B) provides that an enhanced earning capacity award may be "[s]et aside, altered or modified * * * [w]hen *the income* of the person with the enhanced earning capacity *decreases* due to circumstances beyond the person's control[.]"[9] (Emphasis supplied.) The clear implication of that statute is that the enhanced spouse may seek a modification when his or her actual income decreases. It is inconceivable that an enhanced spouse would attempt to argue for a modification simply on the ground that the *average* income for those in his or her field had decreased, if the enhanced spouse's *actual* income

---

[9] An enhanced earning capacity award modification also may be obtained if the enhanced spouse shows that "a good faith career change" has "result[ed] in less income." ORS 107.135(1)(e)(A). Also, either spouse may seek a modification [u]nder such other circumstances as the court deems just and proper." ORS 107.135-(1)(e)(C).

had not.[10] Use of actual income data may not be simply a matter of determining current income and making projections based on anticipated inflation; the figure can be refined by making adjustments for factors such as "market trends and changing conditions" within a particular geographical area and professional specialty.[11] Helen Boyer, Note, *The Treatment of a Professional Degree at Dissolution*, 60 Wash L Rev 431, 455 (1985).

Here, the trial court made the following assessment:

"I have been thinking about this, and somebody can go to medical school and end up like [husband] and make more money than the average for that profession, or somebody can go through medical school and like [Governor] John Kitzhaber, make substantially less money than the average for that particular profession. Or I suspect in my case, go to law school and become a judge and make substantially less than I had expected.

"And if there's—there are two ways to look at it. One as the expert for [wife] did is you look at the actual earnings. Or you could, as [husband's] expert did, just look at well, the degree is worth whatever the average is, and everything

---

[10] When using an individual's actual post-enhancement income, trial courts must take care not to count professional goodwill twice—*i.e.*, once as a discrete, calculable asset and once by virtue of the fact that over time it becomes an aspect of post-enhancement income. I use the phrase "over time" because, upon entering a profession, an individual's income does not reflect the goodwill that may develop over the years as a result of increasing name familiarity, return patients/clients, reputation as a competent practitioner, etc. Over the years, one's income generally becomes at least partially reflective of those "goodwill" factors, which have been described as the value that a practice has "in excess of [the] value of [its] combined physical assets." 2 *Valuation and Distribution*, § 23.05(1) at 23-91. Likewise, enhanced earning capacity will be more important to recover if the parties' marital dissolution occurs early in the enhanced spouse's new professional practice and less important after the nonenhanced spouse has been, in effect, "compensated" by many years of a high standard of living between the time that the nonenhanced spouse contributed to the enhanced spouse's education and the time, years later, that their marriage dissolves. That decrease in importance is mirrored by the decrease in value that will be assigned to enhanced earning capacity as the enhanced spouse nears retirement; the value decreases because of the shorter work-life expectancy.

[11] Here, for example, husband argued that as a result of developments in the managed care system, more patients are referred by HMOs, and medical insurance companies are limiting the number of referrals that primary care physicians are allowed to make to specialists such as husband.

else are either genetic factors or personality factors or personal choice factors in deciding if you go into politics, become a judge, or whatever you want to do. And those really have nothing to do with enhanced earning capacity.

"In candor, I'm more attracted to the idea that enhanced earning capacity goes toward capacity, not actuality. Which would put people like Kitzhaber or someone in my position maybe a little more troubled where this is factored into the calculus.

"But on the other hand, in pushing that a little further, I think you would alleviate some of those problems if you look at how much time has gone by, how long did the marriage continue after the degree was earned, and how much benefit the spouse had as a result of that added earning capacity during the course of the marriage. And how much additional, if any, is it fair for that spouse to walk away from the marriage with."

Because the text of ORS 107.105(1)(f) does not address this issue and I cannot conclusively say that the context of the statute requires a different approach from that taken by the trial court, I have looked to the legislative history for clarification and have found that it supports the conclusion that actual, not average, post-enhancement income figures, were anticipated by at least the sponsor of the bill. During a senate committee discussion of how courts will assign a number to a spouse's enhanced earning capacity, Representative Parks said: "They'll take the earning capacity *as demonstrated.*" Tape recording, Senate Committee on Judiciary, June 9, 1993, Tape 187, Side A at 171. That led to a discussion of award modifications and the question, asked by Senator Shoemaker, of whether a downward modification of an enhanced earning capacity award could be sought by the enhanced spouse purely on the basis of an increase in the *unenhanced* spouse's earning capacity after the divorce. Representative Brown stated that the question demonstrated one of the important differences between spousal support and an enhanced earning capacity award: Although post-dissolution increases in an unenhanced spouse's earning capacity could lead to a modification of a *spousal support* award, an enhanced earning capacity award would *not* be affected by such an increase. She went on to explain that, likewise, if the

enhanced spouse further enhanced his or her career by becoming specialized after the divorce, the unenhanced spouse could not then obtain a larger enhanced earning capacity award through a modification proceeding. *Id.* at 212. Similarly, the legislative history reveals that the senate committee considering the bill specifically contemplated that modifications may be downward, pursuant to subsections (A) and (B) of ORS 107.135(1)(e), *or* upward, pursuant to subsection (C) of that statute, but that upward modifications could not be based on the enhanced spouse's *post-divorce* efforts. Tape recording, Senate Committee on Judiciary, June 9, 1993, Tape 187, Side A at 360-438 (discussion among Representative Parks and Senators Webber, Rasmussen and Shoemaker).

I believe this court should also address the *method* of enhanced earning capacity distribution that was employed by the trial court in this case. The court appears to have evaded the statutory mandate to treat enhanced earning capacity "as property," first by making the award payable only so long as husband works and second by making the award taxable to wife as income. Because it is a periodic payment terminable upon a specific event (husband's decision to retire), and its tax consequences are favorable to husband, the enhanced earning capacity award here is more indicative of a spousal support award than a property award. On the other hand, because husband's professional education is not transferable and will not survive his death or retirement, and because an enhanced earning capacity award is modifiable, by its nature such awards lack some of the qualities that are generally thought of as essential to a distribution of "property."[12]

The problematic aspect of the award in this case is not that it is payable in annual installments[13] but that the

---

[12] The "property" qualities that the enhanced earning capacity award retains are that it is not terminable upon wife's remarriage and will be unaffected by any future increase in her income. The relevant senate committee discussed the "hybrid" nature of enhanced earning capacity awards and concluded that, in some cases, the unenhanced spouse might be better off opting for a spousal support award instead of an enhanced earning capacity award, because the latter award would be dischargeable upon bankruptcy. Tape recording, Senate Committee on Judiciary, June 9, 1993, Tape 187, Side A at 245.

[13] Members of the house subcommittee considered and accepted the possibility that enhanced earning capacity awards, like other property awards, might need to

trial court failed to set a total award *amount*, opting instead to make the award terminate on an unspecified *date*, that is, husband's retirement. Especially here, where the trial court also did not identify the work-life expectancy figure on which its enhanced earning capacity award was based—that is, did not identify how many years it *anticipated* husband would work before retiring—it is almost impossible for either party to contend on appeal that such an indeterminate award is too high or too low, it would be difficult for a party to argue for a modification, it would create an injustice for the unenhanced spouse if the enhanced spouse opted for an "early" retirement and it could create something akin to indentured servitude for the enhanced spouse if he decided to work well past normal retirement age. Therefore, I would also remand for the trial court to set a total amount for the enhanced earning capacity award and to state the work-life expectancy figure on which that award is based.[14]

As the majority opinion notes, husband also challenges the trial court's decision to include goodwill in its valuation of husband's dermatology practice. Husband contends that it is inappropriate to add a figure for goodwill to the valuation that is derived from the formula contained in the dermatology clinic partners' buy-sell agreement and that it is not appropriate for the court to assign value to both goodwill and enhanced earning capacity in the same case, because goodwill and enhanced earning capacity are two different methods of valuing husband's income stream. The statute is silent on this issue.

Members of the house subcommittee considered this problem and satisfied themselves that the two awards are not inherently duplicative. According to Representative Parks, the new enhanced earning capacity statute is directed at capturing a portion of the enhanced earnings that result

---

be "paid out over a period of time" and that judges need to retain discretion as to how payments should be made in individual cases. Tape recording, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 91, Side B at 116, 156.

[14] If this court were to remand, the trial court could, of course, take into consideration the ensuing tax consequences when setting the amount of the award and fashioning husband's payment plan.

from licensing or accreditation, *i.e.*, the building of marketable skills, and is not directed at the earnings that result from the value of the spouse's business. He explained to the subcommittee that enhanced earning capacity "wouldn't have anything to do with" goodwill. Tape recording, Judiciary Subcommittee on Civil Law and Judicial Administration, April 27, 1993, Tape 92, Side A at 060.

The present value of professional goodwill is "the heavily discounted risk-laden *opportunity* to earn excess earnings," which is distinctly different from the excess earnings themselves. 2 *Valuation and Distribution*, § 25.04(5)(c) at 25-54. Clearly, each must be awarded in a manner that takes into consideration, and does not include, the value of the other. Husband is correct that goodwill and enhanced earning capacity are similar, to the extent that both are able to generate future income and both acknowledge the existence of an intangible asset that is connected to the personal services, skills and knowledge of the particular individual after that individual either has built a successful business or acquired an education.

As relevant to ORS 107.105(1)(f), I have concluded that the difference between goodwill and enhanced earning capacity is one of chronology. That is, their significance depends upon how recently they were acquired before the marital dissolution. For example, in this case husband acquired his enhanced earning capacity through education and training that culminated in his becoming a practicing dermatologist in 1987, three years before the parties separated. At that point, he was prepared for a lucrative career but had not had time to develop professional goodwill. By the time the parties divorced in 1994, husband had acquired a certain amount of goodwill by putting to use his education and training. The trial court's letter opinion and judgment shows that it separately considered, valued and distributed the two assets. I would find no error in that approach.[15]

In sum, I would affirm the trial court's decision to make an enhanced earning capacity award to wife, but would

---

[15] I would reject husband's suggestion that the clinic partners' buy-sell agreement was dispositive of, or set an upper limit on, the value that the trial court in this dissolution proceeding could assign to the goodwill of husband's practice.

remand for the court to recalculate husband's enhanced earning capacity without an offset for wife's enhanced earning capacity, to specify the amount of the enhanced earning capacity award and the work-life expectancy on which that award was based, and to modify, if necessary, the payment terms.

Accordingly, I respectfully dissent.

Deits, De Muniz, Armstrong, JJ., join in this dissenting opinion.